# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Fox Moraine, LLC v. United City of Yorkville, 2011 IL App (2d) 100017**

---

| | |
|---|---|
| Appellate Court Caption | FOX MORAINE, LLC, Petitioner, v. THE UNITED CITY OF YORKVILLE, CITY COUNCIL, and THE POLLUTION CONTROL BOARD, Respondents (Kendall County, Intervenor-Appellee). |
| District & No. | Second District<br>Docket No. 2-10-0017 |
| Filed | November 8, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from petitioner's application to construct landfill in respondent city, the finding of the Illinois Pollution Control Board that the statutory criteria were not met was not against the manifest weight of the evidence, and in making that finding, the Board's denial of petitioner's motion seeking the disclosure of a report prepared by respondent city's attorney was harmless error, the Board properly limited an inquiry into the mental impressions of members of the city council, the Board's finding that petitioner forfeited its claim that two members of the council were biased was not error, and the standard of review applied to the statutory criteria by the Board was proper. |
| Decision Under Review | Petition for review of order of Pollution Control Board, No. 07-146. |
| Judgment | Confirmed. |

Counsel on
Appeal

Charles F. Helsten and Nicola A. Nelson, both of Hinshaw & Culbertson LLP, of Rockford, and George Mueller, of Mueller Anderson, P.C., of Ottawa, for petitioner.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Brett E. Legner, Assistant Attorney General, of counsel), for respondent Pollution Control Board.

Anthony G. Hopp and Leo P. Dombrowski, both of Wildman, Harrold, Allen & Dixon, of Chicago, for respondent United City of Yorkville.

James F. McCluskey and James S. Harkness, both of Momkus McCluskey, LLC, of Lisle, for intervenor Kendall County.

James H. Knippen and Adam C. Kruse, both of Walsh, Knippen, Knight & Pollock, Chtrd., of Wheaton, for *amicus curiae* Friends of Greater Yorkville.

Panel

JUSTICE BOWMAN delivered the judgment of the court, with opinion.
Justices Hutchinson and Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1 Petitioner, Fox Moraine, LLC, appeals from the order of respondent the Illinois Pollution Control Board (Board), affirming the decision of respondent the city council of the United City of Yorkville, to deny Fox Moraine's siting application to construct a landfill in Yorkville. On appeal, Fox Moraine argues that the hearings on its application were not fundamentally fair and that the finding that it failed to satisfy the siting criteria in section 39.2(a) of the Environmental Protection Act (Act) (415 ILCS 5/39.2(a) (West 2006)) was against the manifest weight of the evidence. For the reasons that follow, we confirm the decision of the Board.

¶ 2 I. BACKGROUND

¶ 3 This case unfolded when Fox Moraine, owned in part by Donald Hamman, sought to build a landfill in Kendall County. Hamman, a major landowner in the Yorkville area, first spoke with Kendall County leaders about siting a landfill on some unincorporated land

-2-

bordering Yorkville's city limits. When negotiations with the county began to break down, Fox Moraine sought to annex the land, in order to work with Yorkville officials in the siting process. Yorkville residents were familiar with Hamman because he operated a yard-waste facility on a small portion of the land at issue. They were also aware of the proposed landfill because news reports had been published regarding Fox Moraine's discussions with Kendall County. Certain members of the public started a campaign against the landfill during the annexation proceedings.[1] Citizens opposed to the landfill formed a group, Friends of Greater Yorkville (FOGY), and it distributed ads and encouraged members of the public to voice their concerns about the landfill. Ultimately, the land was annexed, and Fox Moraine filed its siting application. The record in this matter is extensive, comprising over 20,000 pages of transcripts. Therefore, we first summarize the procedural history and will discuss the specific relevant facts as we address the pertinent arguments.

¶ 4    Fox Moraine filed a siting application pursuant to section 39.2(a) of the Act on December 1, 2006. The comprehensive application, consisting of several hundreds of pages, addressed the nine criteria outlined in section 39.2. Yorkville then held several hearings in March and April 2007, which resulted in the city council denying the application. It found that Fox Moraine did not meet the criteria set forth in subsections (i), (ii), (iii), (v), (vi), and (viii) of section 39.2(a) of the Act. The city council also determined that Fox Moraine's prior operating history was not in its favor, which is also a consideration set forth in section 39.2(a). The formal city council denial, dated May 24, 2007, included conditions in case the Board or this court reversed its denial. We note that Yorkville conducted a local election to fill the mayoral seat and four aldermanic seats on April 17, which was after the hearings closed but before the council's deliberations and vote. Mayor Arthur Prochaska was defeated by Alderman Valerie Burd. Additionally, three new aldermen were elected: Arden Plocher, Robyn Sutcliff, and Walter Werderich. The "new" city council was sworn in on May 8. On May 24, the three new council members participated in the deliberations and the vote to deny the landfill siting application, along with Aldermen Marty Munns, Joseph Besco, Jason Leslie, Gary Golinski, and Rose Ann Spears.

¶ 5    Fox Moraine timely petitioned the Pollution Control Board, seeking review of the city council's decision and arguing that the proceedings were fundamentally unfair and that the findings on the criteria were against the manifest weight of the evidence.[2] Fox Moraine argues in this appeal that the city council and Board proceedings were fundamentally unfair because: (1) city council members were biased and driven by political considerations, which caused them to prejudge its siting application; (2) the council considered information not

---

[1]Demonstrating the deep divide on the issue, we note that the annexation proceedings were the subject of prior litigation. *Sibenaller v. Milschewski*, 379 Ill. App. 3d 717 (2008) (finding that a referendum was not required for a nonjudicial annexation of contiguous property).

[2]Before the Board, Kendall County intervened in the proceedings, and FOGY and the Village of Plainfield filed *amicus curiae* briefs; each argued in support of the council's decision. In this appeal, the Village of Plainfield did not file an *amicus curiae* brief, Kendall County filed an intervenor brief, and FOGY filed an *amicus curiae* brief.

contained in the record, including a report prepared for Yorkville by attorney Michael Roth of the Wildman Harrold law firm (the Roth Report); and (3) the Board incorrectly applied the deliberative process privilege and did not apply the proper standard in determining whether council members were biased. Regarding council members' bias, Fox Moraine argues that Burd colluded with antilandfill proponents and that her campaign committee was staffed by founders of FOGY. FOGY leaders who worked on Burd's campaign included Plocher, Werderich, Ron Parrish, and Todd Milliron. On the first day of the siting hearings, Fox Moraine moved to disqualify Burd because of her public antilandfill statements, but its motion was denied. Fox Moraine further alleges that prior to taking mayoral office Burd employed the Wildman Harrold law firm to work on defeating the landfill siting application and that she rushed the council to the vote without allowing it adequate time to review all materials.

¶ 6        Fox Moraine alleges that Spears was biased because she performed her own research during the landfill siting proceedings. It alleges that Sutcliff was biased because she campaigned on an antilandfill platform and stated that a landfill would be a "negative addition to the City." It alleges that Werderich and Plocher also campaigned on antilandfill platforms. It argues that Werderich openly stated that one way to stop the landfill was to stop the annexation and that he helped found FOGY shortly after the annexation hearings. Werderich's and Plocher's campaigns were funded by Milliron and Parrish. Plocher was outspoken during the annexation proceedings. According to Fox Moraine, Plocher said shortly before his election that there was no such thing as a safe and compliant landfill and during deliberations on the application he made statements that established that he would never approve the landfill application.

¶ 7        Within its fundamental fairness argument, Fox Moraine argues that the Board erred in denying its motion to compel disclosure of the Roth Report. Fox Moraine had filed the motion on September 24, 2008, arguing that it was not made part of the record despite the fact that the transcripts of the city council's deliberations indicated that the council had received and considered it. Fox Moraine argued that, as a matter of fundamental fairness, it was entitled to know all of the materials the city council considered in making its decision and that there was "no privilege applicable to the Roth report any more tha[n] there would have been a privilege applicable to the report authored by attorney Derke Price." Fox Moraine never requested the Board to inspect the Roth Report *in camera* to determine whether it contained materials that were nonprivileged or that would have prejudiced Fox Moraine. Fox Moraine also did not explicitly argue that Yorkville waived any privilege, although it did argue that council members discussed the report on the record. Further, the Board would not allow Fox Moraine to inquire into the council members' mental impressions, on the ground that the deliberative process privilege barred such questioning of a decision-maker. Fox Moraine argues that the Board misapplied the deliberative process privilege.

¶ 8        Regarding the fundamental fairness of the city council's proceedings, the Board determined that the evidence was insufficient to find that the council's decision-making process was fraught with bad faith and closed minds. While it found that some of the council members might have expressed opinions on annexation, it noted that the record contained

no such statements about the landfill siting application. In addition, the Board rejected Fox Moraine's argument that the conduct of the council members running for election rose to the level of bad faith. The Board also determined that the city council had all materials prior to its deliberations, despite Fox Moraine's argument that a substantial amount of information was submitted on May 23, 2007, which gave the council members little time to review. Regarding Fox Moraine's argument that the city council considered materials outside the record, the Board determined that the Roth Report was protected by attorney-client privilege and that nothing in the record supported Fox Moraine's argument that the city council relied on that report or performed its own outside research. In its denial of the motion to compel disclosure of the Roth Report, the Board stated that Fox Moraine should have filed the motion earlier but that, regardless, the report was protected by attorney-client privilege. The Board's analysis provided: "Fox Moraine concedes that Michael Roth and his firm were hired to assist Yorkville in petitioner's landfill application and proceedings. To that end, as Yorkville asserts, the Roth report is privileged communication because it was Michael Roth's confidential response to Yorkville's request for legal advice regarding Fox Moraine's landfill application."

¶ 9    In addition to arguing that the proceedings were fundamentally unfair, Fox Moraine argues that the city council's finding, affirmed by the Board, that it failed to meet the criteria contained in the Act was against the manifest weight of the evidence. Within this argument, Fox Moraine argues that the Board erred in failing to utilize its technical expertise in considering the evidence. Fox Moraine argues that the evidence supports that it met the criteria set forth in subsections (i), (ii), (iii), (v), (vi), and (viii) of section 39.2(a).

¶ 10    The Board concluded that there was sufficient evidence supporting the city council's findings on the statutory criteria such that the decision to deny the application was not against the manifest weight of the evidence. The Board determined that, although Fox Moraine provided evidence to support its position, the Board was not required to reweigh the evidence or reverse the council's decision merely because the Board could conclude the opposite. With virtually no analysis on each issue, the Board affirmed the council's denial. Fox Moraine moved for reconsideration, which the Board denied on December 3, 2009. Fox Moraine timely appealed.

¶ 11                                II. ANALYSIS
¶ 12                         A. Landfill Siting Process
¶ 13    Under the Act, a party seeking to develop a pollution control facility, such as a landfill, must first obtain approval of the proposed site from the appropriate siting authority. 415 ILCS 5/39(c) (West 2006); *Land & Lakes Co. v. Pollution Control Board*, 319 Ill. App. 3d 41, 44 (2000). If the proposed site lies within an unincorporated area, the siting authority is the county board; if the location is within an incorporated area, the siting authority is the governing body of the municipality. 415 ILCS 5/39(c) (West 2006). If approval is obtained from the siting authority, the developer still must obtain permission from the Illinois Environmental Protection Agency to build the facility. 415 ILCS 5/39(c) (West 2006); *Land & Lakes*, 319 Ill. App. 3d at 45. An applicant seeking siting approval must submit sufficient

details of the proposed facility demonstrating that it meets each of the nine criteria set forth in section 39.2(a) of the Act. *Id.* The nine criteria are as follows:

"(a) The county board of the county or the governing body of the municipality, as determined by paragraph (c) of Section 39 of this Act, shall approve or disapprove the request for local siting approval for each pollution control facility which is subject to such review. An applicant for local siting approval shall submit sufficient details describing the proposed facility to demonstrate compliance, and local siting approval shall be granted only if the proposed facility meets the following criteria:

(i) the facility is necessary to accommodate the waste needs of the area it is intended to serve;

(ii) the facility is so designed, located and proposed to be operated that the public health, safety and welfare will be protected;

(iii) the facility is located so as to minimize incompatibility with the character of the surrounding area and to minimize the effect on the value of the surrounding property;

(iv) (A) for a facility other than a sanitary landfill or waste disposal site, the facility is located outside the boundary of the 100 year flood plain or the site is flood-proofed; (B) for a facility that is a sanitary landfill or waste disposal site, the facility is located outside the boundary of the 100-year floodplain, or if the facility is a facility described in subsection (b)(3) of Section 22.19a, the site is flood-proofed;

(v) the plan of operations for the facility is designed to minimize the danger to the surrounding area from fire, spills, or other operational accidents;

(vi) the traffic patterns to or from the facility are so designed as to minimize the impact on existing traffic flows;

(vii) if the facility will be treating, storing or disposing of hazardous waste, an emergency response plan exists for the facility which includes notification, containment and evacuation procedures to be used in case of an accidental release;

(viii) if the facility is to be located in a county where the county board has adopted a solid waste management plan consistent with the planning requirements of the Local Solid Waste Disposal Act or the Solid Waste Planning and Recycling Act, the facility is consistent with that plan; for purposes of this criterion (viii), the 'solid waste management plan' means the plan that is in effect as of the date the application for siting approval is filed; and

(ix) if the facility will be located within a regulated recharge area, any applicable requirements specified by the Board for such areas have been met.

The county board or the governing body of the municipality may also consider as evidence the previous operating experience[3] and past record of convictions or

---

[3]The parties refer to this factor as the "tenth criterion," even though it is a factor to be considered when determining whether criteria (ii) and (v) are satisfied. For simplicity, we also refer to it as the tenth criterion.

admissions of violations of the applicant (and any subsidiary or parent corporation) in the field of solid waste management when considering criteria (ii) and (v) under this Section." 415 ILCS 5/39.2 (West 2006).[4]

¶ 14    The siting authority must hold at least one public hearing concerning the application. 415 ILCS 5/39.2(d) (West 2006); *Land & Lakes*, 319 Ill. App. 3d at 45. Any person may file written comments concerning the appropriateness of the proposed site, and the siting authority shall consider any comment received or postmarked not later than 30 days after the date of the last public hearing. 415 ILCS 5/39.2(c) (West 2006). "The fact that a member of the county board or governing body of the municipality has publicly expressed an opinion on an issue related to a site review proceeding shall not preclude the member from taking part in the proceeding and voting on the issue." 415 ILCS 5/39.2(d) (West 2006). The siting authority's decision must be in writing and must specify the reasons for the decision. 415 ILCS 5/39.2(e) (West 2006); *Land & Lakes*, 319 Ill. App. 3d at 45. In granting approval for a site, the siting authority "may impose such conditions as may be reasonable and necessary to accomplish the purposes of [section 39.2] and as are not inconsistent with regulations promulgated by the Board." 415 ILCS 5/39.2(e) (West 2006). If there is no final action by the siting authority within 180 days after the date on which it received the request for site approval, the applicant may deem the request approved. 415 ILCS 5/39.2(e) (West 2006).

¶ 15    "The public hearing shall develop a record sufficient to form the basis of appeal of the decision in accordance with section 40.1 of the Act." 415 ILCS 5/39.2(d) (West 2006). Section 40.1 provides in part that, when reviewing a siting authority's decision, the Board shall consider the written decision and the reasons for the decision, the transcribed record of the hearings, and "the fundamental fairness of the procedures used by the [siting authority] in reaching its decision." 415 ILCS 5/40.1(a) (West 2006). We note that, when we review an administrative decision, we exercise special statutory jurisdiction and thus our review is limited by the Act, which allows us to review the Board's decision rather than the siting authority's decision. *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 122 (2007). With these basic requirements in mind, we consider the merits of this case.

¶ 16                          B. Fundamental Fairness

¶ 17    Fox Moraine alleges that it was denied a fair hearing because the city council prejudged its application in light of political considerations instead of basing its decision on the evidence presented during the hearings. According to Fox Moraine, FOGY members worked for Burd's mayoral campaign, the new aldermen ran their campaigns on antilandfill platforms and declared how they would vote before evidence was ever presented, and some based their decisions on their own independent research and the Roth Report. Fox Moraine contends that the Roth Report should have been disclosed and was not protected by the attorney-client privilege.

---

[4]It is undisputed that criteria (iv), (vii), and (ix) do not apply in this case.

¶ 18                    1. Summary of Facts Relevant to Fundamental Fairness

¶ 19        The annexation was the subject of several public hearings from late 2006 through January 2007, and the issue was heated among the city council members and Yorkville residents. Plocher and Milliron were publicly against the annexation of several parcels of land because a landfill was proposed for the site. Parrish and Werderich also spoke out in opposition. Numerous members of the public also spoke out against the annexation because of the landfill rumors. The council members were quick to remind the members of the public that annexation was the only issue in question at the time and that, should a landfill or any other use for the land become an issue, it would be considered and there would be hearings at that time. Our review of the record discloses that the council members were careful not to discuss the landfill issue and focused solely on the annexation issue. Ultimately, the city council approved the annexation, with Aldermen Burd, Spears, and Leslie voting against it.

¶ 20        Later, Fox Moraine filed an annexation petition relating to the vacation of Sleepy Hollow Road, which was not annexed earlier with the other parcels but was a necessary parcel for the landfill application, already filed. After a hearing on January 23, 2007, at which the public protested the annexation, the city council approved the vacation of the road. During the hearing, the members of the public were advised not to discuss the particular criteria required for the landfill but to limit the discussion to annexation. Milliron took the opportunity to accuse the council of being "cozy" with the owners of Fox Moraine and of rushing the annexation process to get the landfill built, against the residents' wishes. Mayor Prochaska and council members again warned the public to limit comments to the question of annexation, to avoid problems regarding the fairness of landfill siting hearings if such hearings were held later. Spears stated that she was voting against the annexation because she believed proper statutory procedures were not followed, not because the public was against the landfill. Burd wanted more information regarding the value of the road. Ultimately, the vacation was passed, with Burd and Spears voting against the measure. It is duly noted that throughout the annexation proceedings, the general public sentiment was antilandfill and antiannexation. However, contrary to Fox Moraine's allegations pertaining to the annexation proceedings, the aldermen and Mayor Prochaska did not vocalize their positions on the landfill one way or the other.

¶ 21        On March 7, 2007, the hearings on the siting application commenced. Larry Clark was appointed by Yorkville to act as the hearing officer for the public hearings. Justin Wyeth was Yorkville's city attorney. Additionally, pursuant to a Yorkville ordinance on its siting procedures, Yorkville retained Derke Price to represent the city as special counsel. The ordinance provided that both Clark and Price would prepare memoranda of their recommendations at the conclusion of the hearings and that those memoranda be placed in the record during the public commentary period. Fox Moraine moved to disqualify Burd and Spears from the decision-making process on the ground that they were biased. That motion was ultimately denied on the night of deliberations because Fox Moraine did not present any evidence proving they had prejudged the application.

¶ 22        The public's antilandfill sentiment continued during the siting proceedings. On March 9, Price informed Clark that some members of the city council had received threatening phone calls at their homes, and Clark admonished the members of the public that any *ex*

*parte* communications were inappropriate as the city council had a unique role, similar to that of a judge or a jury, in these particular proceedings. Clark admonished the public that any contacts made outside the hearings would jeopardize the process. Clark's balanced approach of handling the crowd and the attorneys continued throughout the proceedings.

¶ 23     During the course of the proceedings, FOGY ran ads, which are contained in the record, urging residents to write letters asking the mayor and city council members to vote against the landfill. The ads stated that, if the landfill were approved, Yorkville would get "an eternal pit of garbage," "constant noise," "garbage stink and methane gas," "sea gulls and turkey buzzards," "contaminated wells," and a new name, "Dumpville." Residents submitted numerous handwritten antilandfill notes at the proceedings, most citing concerns about potential health risks, water contamination, noise, smell, and traffic, along with the lack of need for a landfill to be located in Kendall County. On various days, several hours were set aside for the public to make oral comments, in addition to the written comments submitted. The gist of most comments related to fears of odors, environmental contamination, health risks, effects on property values, and traffic. Many residents submitted articles on landfills, which they found on the Internet. Some of the public comments drew attention to previous complaints about the property, which Hamman currently operated as a yard-waste facility.

¶ 24     Milliron was outspoken during the landfill siting hearings. He accused Bock and Leslie of personally talking to Hamman about the "pet landfill project." He accused Mayor Prochaska of already sealing the deal by virtue of signing a host agreement with Fox Moraine. He accused the city council as a whole and the mayor of collusion and bias toward allowing the landfill, because they had spoken to Hamman. Darryl Hyink, a retired industrial arts teacher, spoke at length expressing his concerns about the need for the landfill and the potential for leachate. Other than noting that he opposed the landfill, we do not go into the details of his presentation, as he had no expertise in geology or technical engineering. Counsel for Fox Moraine was afforded an opportunity to cross-examine Hyink on the fact that his opinions were not based on any actual expertise in the area of hydrogeology, geology, engineering, or solid waste management.

¶ 25     The public hearings closed on April 20, and written comments were accepted through May 21, 2007. On the last day of the public commentary period, Price submitted his memo, recommending that certain conditions be imposed if the city council decided to approve the application. Clark also submitted his memo, recommending approval with Price's conditions. During that time, Burd, as the newly sworn mayor, moved to appoint Roth as interim city attorney; the council approved the motion. On May 23, 2007, the new city council met to deliberate on the landfill application. The May 23 session was an open hearing for the city council to consider the evidence presented, Clark's and Price's recommendations, and any materials submitted during the public commentary period. Clark and Price did not attend, as they were not to deliberate; the session was for the council to deliberate. However, Roth was present.

¶ 26     Initially, Munns complained that they had just received the recommendation memoranda from Clark and Price. Munns said that he could not digest all the new materials in addition to all that he had taken in from the hearings. Golinski concurred, stating that "[s]ince Friday there's been a thousand pages of information filed. I don't know how we are expected to

-9-

process that and deliberate in any manner today."

¶ 27 There was discussion to continue the debate, to afford time for the aldermen to review the more than 1,000 pages of posthearing documents. A decision was required by May 29, as the Act requires that a decision be made within 180 days or an application will be deemed approved. Spears stated that she wanted to deliberate now because, in reality, there was no way she could go home and read more than 1,000 pages before she started work the next morning. She felt prepared to decide based on her recollection of the hearings. Besco commented that it would be a challenge to review the new materials in one night. Besco, however, moved to continue the debate. Spears, Sutcliff, Golinski, Plocher, and Burd voted to deny that motion. Each alderman was then given 20 minutes to speak. Sutcliff spoke first, stating that there was no way a landfill could be designed to minimize impact on property values and that the proposed property protection plan did not cover farmland property. Sutcliff also believed that the truck traffic could not be minimized.

¶ 28 Spears spoke out on each criterion, finding that Fox Moraine failed on each one. Regarding criterion (ii), she cited FOGY witness William Schmanski's review of the storm water management deficiencies. She noted the fact that Devin Moose, a civil engineer who completed the siting application, accepted Stan Ludwikowski's suggestion to add wells, confirming Moose's design errors. She also took issue with the unknown history of the proposed landfill operator. Regarding property values, Spears did not believe that Fox Moraine could minimize the impact on property values and she thought that the property protection plan was insufficient.

¶ 29 Plocher stated that the traffic issue could not be minimized and that he could not vote for a landfill because it could leak and contaminate the water. He stated "the applicant said that the landfill leaked, and this to me is a direct cross contamination of potable water in my eyes and is against the law, so therefore, I could not vote." He continued, "I could also never personally jeopardize my friends and family and the residents of this community on any health issue as someone has done to my family. *** I live with my brother, Jimmy Plocher. *** He is 21 years of age, with cerebral palsy, and there is no way that I could sleep at night knowing that I voted yes and can do this to someone else."

¶ 30 Leslie believed that Fox Moraine failed to satisfy criteria (iii), (vi), and (viii). His reasons were somewhat unclear, other than that he did not think the landfill could be sited on municipal land. Munns stated that the memos that he "got today from Mr. Roth and Mr. Price and Mr. Clark" expressed highly conflicting opinions on a couple of the criteria. Munns stated that he could not approve criterion (i) unless Price's conditions were imposed and that he needed to review criterion (ii)'s conditions. On criterion (iii), Munns noted that one attorney said that it was not met; we deduce that this was Roth, as Clark and Price found criterion (iii) satisfied. Munns was also undecided on criterion (vi) because he did not believe that operating the landfill would generate a significant number of trucks.

¶ 31 Werderich spoke against Fox Moraine's satisfaction of the criteria, stating that there was no need for a landfill, a landfill did not comport with Yorkville's future plan for itself, the design was unsafe, property values would drop, and traffic would worsen. He also cited some past odor complaints regarding Hamman's composting business. His comments were

extensive on each point. In conclusion, Werderich commented on Price's memo, stating that the application should be considered on its face and "not based upon the conditions" suggested by Price, which he "briefly" looked at.

¶ 32    Golinski stated that he did not prepare a speech like the others because he thought the purpose of the meeting was to deliberate, but he said, "it looks to me already we have five no votes on several criteria already." Golinski wondered what the odds were that the Board would overturn its decision and the landfill could then be sited without the host agreement.[5]

¶ 33    Besco thanked Werderich for "going through the attorney–the City Attorney Michael Roth's presentation, now I don't have to read his stuff." Besco stated that he wished Price or Clark were present to answer questions. Roth advised that the council's decision should be based upon the record before it, including the memos from Price and Clark, but that the council could not ask more questions or seek more information. Ultimately, Besco decided to wait to comment until he could review the new materials.

¶ 34    Munns and Burd argued about when the vote should take place. Burd wanted to vote by May 24; Munns urged that, for the council to decide the proper way, it be allowed to use the six days it had to review the additional materials. Munns argued that "if we don't do this properly and we lose it on appeal, there's still going to be a landfill there, and we went through all of this for nothing." Burd stated that Fox Moraine did not have to wait until the last day to submit the materials; Munns pointed out that neither did Clark, Roth, or Price. Burd suggested that they use their own judgment, "thumb through this," and come up with a solution. Burd then opened with her comments as mayor, thanking the aldermen for doing a great job in voicing their concerns. Burd commented that she wanted to "thank the Aldermen who did the research, and like usual, Alderman Spears, you did a great job, so thank you very much." Mayor Burd then directed Roth to prepare a resolution consistent with their deliberations, for consideration and decision on the next night, May 24.

¶ 35    The next night, Golinski commented that he had reviewed the application in its entirety, sat through every hour of testimony, reviewed all the evidence, and kept an open mind throughout the proceedings. Golinski went on to find that Fox Moraine failed on criterion (i), because he believed that the evidence showed that there already was sufficient landfill space for the service area. Because of the design oversight with regard to the storm water wells that Moose had agreed to change, Golinski questioned "how many other design flaws or geological deficiencies" there were. Golinski did not believe that the application could "guarantee that leachate will not leak out of the proposed facility and contaminate private wells" or the Hollenbeck Creek. He also found that who would operate the landfill was uncertain, because Peoria Disposal was proposed as the operator but was only a 20% owner. He found Fox Moraine's experts disingenuous regarding minimizing the property value impact. Further, he agreed that the plan to route traffic through downtown Plainfield and Yorkville was "simply ludicrous." Golinski agreed that criterion (vi) was not met.

¶ 36    Besco then stated that he did not believe that the city council was the appropriate judging

_____

[5]The host agreement provides that it is inoperable if the council's decision is overturned by the Board or on appeal.

-11-

body. He wanted to ask Price more questions about his memo but could not. Besco also mentioned that he had endured personal threats and constant taunting, and while he admired the opposition group's passion, he despised its tactics. He had reviewed the final documents all night and believed that Clark's summary was most influential, and he was aware that a lot of people would not agree with his decision. Besco stated:

> "I also know there is a record of many seated officials here that have made statements or been involved with the opposition and that–I think that's going to make them look bad when the Pollution Control Board gets to review this and I think some have shown bias."

¶ 37    Roth then explained that he had prepared resolutions to approve, to approve with conditions, and to deny with conditions. He explained that the council had decided to include conditions with a denial so that, in the event that the Board or a higher authority reversed its denial, an approval would be with conditions. The aldermen then voted to deny with conditions, with only Besco voting against the denial.

¶ 38    During the Board's hearings on fundamental fairness, additional evidence was adduced. Yorkville admitted in interrogatories that some of the aldermen had received phone calls and e-mails from members of the public but that they had responded by stating that they could not speak about the application and that they would consider all the evidence fairly. Yorkville also admitted that Burd, Plocher, and Werderich received campaign contributions from members of FOGY. Werderich held the office of secretary of FOGY from October 2006 through December 2006.

¶ 39    The record contains a copy of an article from the Sunday Beacon News from April 16, 2007. The article reads "THE LANDFILL Yorkville candidates weigh in." The candidates were asked, "would a safe, state-compliant landfill be a positive, negative or neutral addition to Yorkville." Mayor Prochaska declined to comment on the relative merits of the landfill. Burd is quoted as stating, "Is there such a thing as a safe, state-compliant landfill? . . . I don't know if that's an oxymoron." Werderich stated, "I don't think that [a landfill] is a good thing for Yorkville." The article also noted that Werderich was backing Burd and once belonged to a group opposed to the landfill. Plocher stated, "I don't think there is any such thing as a safe, state-compliant landfill." It was also noted that Plocher backed Burd and once worked with citizens to fight the landfill. Bock refused to return the paper's phone calls. Sutcliff stated, "it would be a negative addition to the city. I have no question about that," and it was noted that she backed Burd. Spears stated, "If it had nothing surrounding it for acres, and if it was proven to be safe as far as leakage, and if it would have no impact on traffic, that would be a perfect scenario." She too backed Burd.

¶ 40    The Board then conducted hearings on April 21, 22, and 23, 2009. Spears testified that she could not recall voting on the annexation or the host agreement and could not recall that the public's sentiment at the council meetings was antilandfill and antiannexation. Upon refreshing her recollection, Spears recalled voting on both. She recalled voting against the vacation of Sleepy Hollow Road, not to block the landfill application but because she felt improper procedures had been followed. She also recalled being asked by a Beacon News reporter, "Would a safe, state-compliant landfill be a positive, negative, or neutral addition to Yorkville?" Spears testified that she had been misquoted, because the answer in the

newspaper did not "sound like something I would've said." Spears admitted that she received e-mails from constituents regarding the landfill. She could not recall how many. People also approached her and Spears would hand those people preprinted laminated cards, which Price had given to council members, that said that she could not speak about the landfill. When Sutcliff was running for council, Spears advised her of the cards and the fact that if she were elected, she would be a judge, and Spears told her not to make comments about the landfill.

¶ 41    Spears could not recall receiving any other reports besides Clark's and Price's memos. She recalled that they had many meetings with the city attorneys but she could not recall times or dates of those meetings. However, Spears stated that all the meetings were open and would have been recorded and transcribed. Regarding Burd's comment thanking Spears for her research, Spears stated that it was for her notes and documentation on the evidence presented and not for additional research.

¶ 42    Parrish testified next. Parrish was an officer of FOGY. FOGY's founding members included Milliron, Werderich, and Parrish. Parrish donated money to Werderich's campaign. He denied hearing Werderich speak out against the landfill. He had heard him speak out against the annexation. Parrish supported Werderich because he believed that Mayor Prochaska and council members supported the landfill as a "done deal." Parrish also gave money to Plocher's and Burd's campaigns. He admitted that FOGY was formed to oppose the annexation and the landfill but said that it also opposed other development projects along Route 71.

¶ 43    Burd testified that she was elected mayor on April 17, 2007, and sworn in on May 8. Prior to that, she was an alderman. Burd voted against the annexation, the host agreement, and the vacation of Sleepy Hollow Road. She testified that she did not understand the annexation to be related to the landfill. She did not recall being informed that Fox Moraine intended to file a landfill siting application with Yorkville if the property were annexed. Burd testified that she decided to run for mayor in late summer 2006, which was during the annexation hearings. Her campaign committee was comprised of Werderich, Milliron, and Parrish. She testified that she was not aware that Milliron and Parrish opposed the landfill. She could not recall Milliron or Parrish speaking out during any of the city council meetings on annexation or the landfill siting hearings. However, Burd acknowledged in her deposition that Milliron had become so disruptive during the hearings that he was threatened to be removed by the police. Plocher was also involved in Burd's campaign, and she denied knowing that he was a landfill opponent. She claimed that she was unaware that Parrish was involved with FOGY but was aware that Werderich was a member. However, she knew Werderich resigned so that he could help on her campaign.

¶ 44    Burd denied receiving campaign contributions from FOGY but acknowledged that Parrish donated money and two round-trip airfare tickets for a raffle for her campaign. Burd acknowledged that she responded to the Beacon News reporter's question of "Would a safe, state-compliant landfill be a positive, negative, or neutral addition to Yorkville?" with "Is there such a thing as a safe, state-compliant landfill? I don't know if that's an oxymoron." She denied that she ran her campaign on an antilandfill platform.

¶ 45    Burd admitted that, prior to being sworn in, she met with attorneys from Wildman

Harrold. She told them that she would hire them on May 8 to replace Wyeth. When asked why she hired Wildman Harrold to work on the landfill issue when the city had retained Price as special counsel on that matter, Burd testified that she understood Price as representing the staff, not the city itself.

¶ 46    Sutcliff testified that she started her aldermanic campaign in 2006. She started a website in part to facilitate her campaign. Sutcliff admitted that the site contained accounts of various city council meetings and included photos of antilandfill proponents. She insisted that she was just reporting the happenings at the city council and that the site did not contain her personal opinions. She admitted that her website gave readers explicit direction to FOGY's website but contained no contact information for Fox Moraine. She admitted saying in response to comments by Mayor Prochaska that "regardless of what the people want, there may be a dump here anyway." She denied that this was an antilandfill statement. Sutcliff admitted that she had written that the city was rushing through the annexation and had advised people that "I'm asking you to take action. If you want to stop the landfill, you can do several simple things to make a difference." She then wrote on the website, "Vote for new leadership by voting for Robyn Sutcliff on April 17, 2007. I will vote against the annexation of a landfill property."

¶ 47    Sutcliff testified, however, that while campaigning, after Spears advised her not to speak to the public about the landfill, she told the public that she was unable to speak about it. She also "scrubbed" her website and stopped her newsletter. Her website ran from January 2007 until April 2007. It was unclear when the site was "scrubbed." Sutcliff admitted to distributing antilandfill campaign brochures prior to Spears' advice. Sutcliff was unsure whether she received campaign funds from FOGY or FOGY members.

¶ 48    Sutcliff acknowledged that the council received a substantial amount of materials on the evening of May 23. She did not recall whether Price's or Clark's report was contained in that material. She also did not recall that Fox Moraine submitted 1,400 pages of materials that evening. She did not recall that she voted on the resolution the next night. She testified "I don't recall. I wasn't–I didn't review any of that. It's two years ago. I don't remember." Sutcliff denied that she did any independent research on landfills prior to or around the time of her campaign. When asked how she reached the conclusion that she was against the landfill if she did not research the issue, she answered, "I was uninformed, I believe, at the time." Sutcliff admitted that she told the Beacon News in response to its question about a landfill, "A landfill would be a negative addition to the city. I have no question about that."

¶ 49    Werderich testified that he announced his candidacy for alderman at the end of October 2006. He was one of the founders of FOGY, along with Parrish. FOGY was founded a couple of months after the annexation of the Fox Moraine property. He admitted that public sentiment was antiannexation because people believed that the only purpose for annexing the land was to build a landfill. Werderich, an attorney, spoke out against the annexation and criticized the city for rushing through the process. Werderich eventually resigned from FOGY and ran for an aldermanic seat, although he remained with FOGY during part of his campaign. He admitted that the local newspapers included articles about his campaign, his growing frustration over the city's handling of the landfill, and his work to mobilize the public to voice its concerns. Werderich admitted that one of his campaign materials stated

-14-

that he was one of the first to question the annexation of the landfill property. He also admitted saying at one of the council meetings that the landfill hearings were not an adversarial process but that "the hearing process presents only one side of the story. That's the side of the people that want to put in the landfill." He acknowledged that the Beacon News printed his answer to its landfill question as "I don't think that the landfill is a good thing for Yorkville." However, Werderich claimed that he gave the reporter many pros and cons about the landfill but that she printed only this answer. He did not complain to the reporter about the mischaracterization because he did say what was printed. He admitted that his campaign website included a link to FOGY's website, but he said that it also had links to other organizations.

¶ 50    Plocher testified that he did not recall that, during one of the initial annexation meetings in September 2006, he stood up and stated, "I live in Yorkville, and I don't want it to smell worse than it already does." Plocher testified that he had attended about 99% of the landfill siting hearings because he knew he could possibly end up on the council that had to decide the issue. He testified that he read the transcripts of the few that he missed. Plocher worked on Burd's campaign along with Ed Sleezer, Werderich, Parrish, and Milliron. He knew that all those men were antilandfill. Plocher received campaign contributions from Milliron. He admitted that he had replied, "I don't think there's any such thing as a safe, state-compliant landfill" to the Beacon News reporter's question. He explained that he told the reporter that making a state-compliant landfill was very hard due to cross-contamination concerns.

¶ 51    Munns testified that he did not have time to review the newly submitted materials. He admitted that Roth provided no explanation as to why Clark and Price did not attend the deliberations.

¶ 52    Besco testified that he was the only alderman who voted in favor of the siting application. He first became aware of Fox Moraine's intentions a few months prior to the annexation hearings. Burd had informed him of the potential for the landfill being sited near Yorkville and that she wanted to get it into the city because the tipping-fee funds would be a positive for the city. Besco went with Burd to several meetings about the prospect, and he thought that she had a favorable attitude toward the landfill because of the financial benefits available to the city. However, at the annexation hearing, which was heavily attended by angry members of the public, Burd flipped and voted against the annexation. During those proceedings, Besco received a threatening phone call and filed a police report. Munns had received a similar call from the same phone number. Milliron and Parrish were frequent attendees and speakers at the public meetings, and Besco knew them to be "forcefully" against the landfill. At one point, Milliron called Besco a eunuch, and the mayor and the council had Milliron removed that day. Besco believed that Clark did a good job of handling the landfill siting hearings and that Clark did not accept a lot of the outspokenness that was going on during the council meetings. Besco testified that Burd brought in Price, and the council approved him to act as attorney for the city staff. Besco admitted that he was testifying at the request of Fox Moraine.

¶ 53    Moose testified that he believed that the Yorkville siting process had taken longer than any siting process in which he had participated, because FOGY's attorney objected to longer hearings and was often tardy. Because of that attorney's reluctance in agreeing to times and

dates, more hearings were required. Attorneys' objections and public outbursts consumed more time. Moose considered this the worst siting proceeding he had ever been involved in. On cross-examination, Moose admitted that he was responsible for completing and filing Fox Moraine's application, that he did so on December 1, 2006, and that he knew Yorkville had elections in April 2007. He also knew that Yorkville had 180 days to act on the application and that a landfill can be a controversial topic for a town. Moose admitted that Fox Moraine was afforded the opportunity to present its experts during the siting hearings.

¶ 54 Charlie Murphy testified that he was the project manager for Fox Moraine. He had been through 12 siting proceedings. He met with city council members in August 2006 after talks with Kendall County failed to produce a deal between the county and Fox Moraine. A host agreement with Yorkville was approved on September 26, 2006. The public's animosity was evident during the annexation hearings. Murphy admitted that the mayor often admonished the crowd that the annexation had nothing to do with the landfill but would affect only whether Yorkville or the county would review any applications for any type of development. Murphy believed that Fox Moraine had a full opportunity to offer evidence in support of its landfill during the siting hearings. Murphy monitored the news articles published about the landfill. He believed that Plocher, Sutcliff, and Werderich were biased against the landfill and had run for election on that issue. He admitted that Fox Moraine had moved to disqualify Burd and Spears at the beginning of the hearings but had never filed a motion to disqualify Plocher, Sutcliff, and Werderich after they were elected. James Burnham testified that he was a consultant for Fox Moraine, and his testimony was consistent with Murphy's.

¶ 55 Finally, Hamman testified that he was a 51% owner of Fox Moraine, with Groot Industries owning the other 49%. Hamman admitted that, when Fox Moraine filed its application, he knew that the mayor and some aldermen would be up for reelection in April 2007. He knew that a landfill could be a controversial topic. Upon reading the April 16, 2007, edition of the Beacon News, Hamman believed that Plocher, Sutcliff, and Werderich made biased comments about the landfill.

¶ 56 2. Fundamental Fairness Analysis

¶ 57 Section 40.1 of the Act provides that, if the siting authority refuses to grant approval, the applicant may petition the Board to contest the decision. 415 ILCS 5/40.1(a) (West 2006). The Board shall conduct a hearing, with the applicant appearing as the petitioner and the siting authority appearing as the respondent. At the hearing, the burden of proof rests on the petitioner; "however, no new or additional evidence in support of or in opposition to any finding, order, determination or decision *** shall be heard by the Board." *Id.* Further, section 40.1(a) states:

"In making its orders and determinations under this Section the Board shall include in its consideration the written decision and reasons for the decision of the county board or the governing body of the municipality, the transcribed record of the hearing held pursuant to subsection (d) of Section 39.2, and the fundamental fairness of the procedures used by the county board or the governing body of the municipality in reaching its decision." *Id.*

¶ 58    While the Board is usually confined to the siting authority's record of the proceedings (*id.*), the Board may hear new evidence when considering the fundamental fairness of the proceedings, as such evidence often lies outside the record. *Land & Lakes*, 319 Ill. App. 3d at 48.

¶ 59    In determining whether the proceedings were fundamentally fair, we first note the appropriate standard of review. An administrative agency's determination of facts will not be disturbed unless it is contrary to the manifest weight of the evidence. *Land & Lakes*, 319 Ill. App. 3d at 48. When an agency decision presents a mixed question of law and fact, the agency decision will be reversed only if it is clearly erroneous. *Id.* The clearly erroneous standard lies between the deferential manifest-weight-of-the-evidence standard and the *de novo* standard. *Id.* We apply a clearly erroneous standard to decisions on mixed questions to provide some deference to an agency's experience and expertise in dealing with its particular subject matter. *Id.* Whether proceedings were fundamentally fair is a mixed question of law and fact, and thus we apply the clearly erroneous standard. *Peoria Disposal Co. v. Illinois Pollution Control Board*, 385 Ill. App. 3d 781, 796 (2008).

¶ 60    A siting authority's role in the siting-approval process is both quasi-legislative and quasi-adjudicative. *Land & Lakes*, 319 Ill. App. 3d at 47. Recognizing this dual role, courts have interpreted the applicant's right to fundamental fairness as incorporating minimal standards of procedural due process, including the opportunity to be heard, the right to cross-examine adverse witnesses, and impartial rulings on the evidence. *Id.* at 47-48. The members of a siting authority are presumed to have made their decisions in a fair and objective manner. *Peoria Disposal*, 385 Ill. App. 3d at 797. This presumption is not overcome merely because a decision-maker has previously taken a public position or expressed strong views on a related issue. 415 ILCS 5/39.2(d) (West 2006); *Peoria Disposal*, 385 Ill. App. 3d at 797-98. To show bias or prejudice in a siting proceeding, the petitioner must show that a disinterested observer might conclude that the siting authority, or its members, had prejudged the facts or law of the case. *Id.* at 798. Additionally, issues of bias or prejudice on the part of the siting authority are generally considered forfeited unless they are raised promptly in the original siting proceeding, because it would be improper to allow the petitioner to knowingly withhold such a claim and to raise it after obtaining an unfavorable ruling. *Id.*

¶ 61    Because of the nature of the proceedings, *ex parte* communication between the public and the decision-makers is inevitable. *Id.* Courts have recognized this based on the understanding that members of siting authorities are not judges, but locally elected officials. Naturally, constituents will relay their concerns to these officials, unaware that the officials will be acting in an adjudicatory role and that such *ex parte* communication is improper. *Id.* A reviewing court will not reverse a decision because members of the siting authority have received improper *ex parte* communications unless there is a showing that the petitioner suffered prejudice as a result of those communications. *Id.* "Mere expressions of public sentiment are not sufficient for a showing of prejudice. *** Nor does the existence of strong public opposition render the proceedings fundamentally unfair, as long as the applicant is provided with a full and complete opportunity to present evidence in support of its application." *Id.* With this legal framework in mind, we review the underlying proceedings as they relate to Fox Moraine's fundamental fairness arguments.

-17-

¶ 62 We first address the Roth Report. The Board, in a separately issued order addressing Fox Moraine's motion to compel disclosure of the Roth Report, determined that it was protected by the attorney-client privilege. Fox Moraine argues that the Board failed to address its argument that the Roth Report may have contained information that was not included in the record. Fox Moraine argues that the transcripts of the deliberations made clear that the aldermen relied on the Roth Report but that, without access to it, Fox Moraine was unable to determine whether the report contained inappropriate material. The Board argues that it did not err in denying the motion, because it was clear that Roth prepared the report in his capacity as city attorney and Fox Moraine provided no reason to compel its disclosure.

¶ 63 We review *de novo* the question of whether the attorney-client privilege or any exception thereto exists. *Lama v. Preskill*, 353 Ill. App. 3d 300, 305 (2004). The supreme court has stated that "where legal advice of any kind is sought from a professional legal advisor in his capacity as such, the communications relating to that purpose, made in confidence by the client, are protected from disclosure by himself or the legal advisor," except where the protection is waived. *Fischel & Kahn, Ltd. v. van Straaten Gallery, Inc.*, 189 Ill. 2d 579, 584 (2000). The purpose of the attorney-client privilege is to encourage and promote full and frank consultation between a client and his attorney by removing the fear of compelled disclosure of the information. *Id.* at 584-85. Since the privilege is an exception to the general duty to disclose, the party asserting the privilege carries the burden of proving that it applies (*Shere v. Marshall Field & Co.*, 26 Ill. App. 3d 728, 730 (1974)), and the privilege is interpreted narrowly (*Ferguson v. Georges*, 409 Ill. App. 3d 956, 966 (2011)). Illinois courts adhere to a strong policy of encouraging disclosure, "with an eye toward ascertaining that truth which is essential to the proper disposition of a lawsuit." *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 190 (1991). The attorney-client privilege is available to a municipality. *Ferguson*, 409 Ill. App. 3d at 967. The protections afforded by the privilege may be waived by the client. *Lama*, 353 Ill. App. 3d at 305. The waiver may be either express or implied. *Id.*

¶ 64 In this case, Yorkville has established that Roth was retained as city attorney and was asked to prepare the Roth Report to advise it on the landfill matter. However, it was not established that the Roth Report was intended to be confidential or that it remained confidential. The members of the city council discussed the Roth Report during open deliberations and discussed that Roth's advice was to deny the application, as demonstrated by the aldermen stating that there was conflicting advice presented to them by Roth, Price, and Clark. While the Board and Yorkville argued at oral arguments that Fox Moraine did not argue waiver, Fox Moraine did argue that the council openly discussed the report during deliberations and that it thus was not covered by the privilege. The Board's analysis in its denial of Fox Moraine's motion to compel did not analyze this aspect of Fox Moraine's argument.

¶ 65 In *Lama*, the court stated that the "privilege may be impliedly waived when the client asserts claims or defenses that put his or her communications with the legal advisor at issue in the litigation." *Id.* The court further stated, "[i]n other words, an implied waiver occurs 'where a party voluntarily injects either a factual or legal issue into the case, the truthful resolution of which requires an examination of the confidential communications.' " *Id.*

-18-

(quoting *Pyramid Controls, Inc. v. Siemens Industrial Automations, Inc.,* 176 F.R.D. 269, 272 (N.D. Ill. 1997)). While the city council did not get into particular statements from the Roth Report, the council's discussion of the Roth Report disclosed that Roth's recommendations differed from those of Clark and Price and arguably established that the council did not consider the report confidential but, rather, treated it as part of the record before it, along with the reports of Clark and Price.

¶ 66        In *People ex rel. Hopf v. Barger*, 30 Ill. App. 3d 525, 536 (1975), an issue related to the attorney-client privilege and the Open Meetings Act arose, which is instructive though not directly on point. In *Barger*, the defendants (Wheaton city officials) were charged with failing to comply with the Open Meetings Act (Ill. Rev. Stat. 1971, ch. 102, ¶ 41 *et seq.*) when they conducted a closed meeting of the Wheaton city council to discuss annexation and zoning of property. *Barger*, 30 Ill. App. 3d at 529. The defendants argued in part that the Open Meetings Act would compel violating the attorney-client privilege if they were prevented from private consultation with an attorney as to foreseeable litigation. *Id.* at 537. The appellate court concluded that in drafting the Open Meetings Act (now 5 ILCS 120/1 *et seq.* (West 2006)) the legislature did not intend for consultation between a governing body and its attorney to always be conducted openly and that an advance consultation with its attorney was not a "meeting" as contemplated in the Open Meetings Act. *Barger*, 30 Ill. App. 3d at 538. However, the court went on to conclude that "consultations by a governing body with an attorney in private may be used as a device to thwart the liberal implementation of the policy that the decision-making process is to be open and that confidentiality is to be strictly limited. The balance between the two must always be resolved in the public interest on a case-by-case basis." *Id.* Ultimately, under its facts, the court found that Wheaton did not need to conduct a closed meeting because it was clear that the city council was not meeting to consult with the city's attorney privately, others were present at the meeting, and they were not discussing prospective litigation. *Id*.

¶ 67        The reasoning in *Barger* seems most applicable to the facts of this case. Yorkville was well within its rights to consult with its attorney confidentially, but when the aldermen spoke freely about the Roth Report at the open deliberations, it appears that they might have waived the privilege. As Yorkville argues, Clark was retained pursuant to a Yorkville ordinance that provided that Clark submit written findings of law or fact to the council and file a copy with the city clerk. Price was similarly retained under this ordinance as "special counsel" and was required to submit his report pursuant to the public hearing process. Yorkville argues that Roth was not held under the same rule. We agree that the ordinance did not mandate Roth, as city attorney, to submit his impressions. However, the council did not treat the Roth Report as confidential when it openly discussed it during the public deliberations. The deliberations were not required, and further, the aldermen were not required to discuss the Roth Report if they chose to deliberate. See *Waste Management of Illinois, Inc. v. Pollution Control Board*, 175 Ill. App. 3d 1023, 1044 (1988) (fundamental fairness does not require the decision-makers to debate the evidence and recommendations submitted; the only statutory requirement is that the council put its decision in writing and specify the reason for the decision).

¶ 68        At oral argument, when asked about waiver, the Board and Yorkville argued that one city

council member could not waive the privilege for the entire city council and that only Munns mentioned the report. We disagree that only Munns mentioned the report. The record reflects that Besco thanked Werderich for "going through the attorney–the City Attorney Michael Roth's presentation, now I don't have to read his stuff," indicating that Werderich made comments that came from the report.

¶ 69 It appears that the council considered the Roth Report like the other submitted memos rather than as confidential advice from Roth, thereby waiving the attorney-client privilege. However, Fox Moraine never requested the Board to inspect the report *in camera* to determine whether any of Roth's recommendations were based on evidence outside the record, as Fox Moraine argued. Had the Roth Report been submitted like Price's and Clark's memos, Fox Moraine could not have responded to it. See *Land & Lakes*, 319 Ill. App. 3d at 51 (parties cannot cross-examine written materials submitted as public comment, and the Act does not require that the public comment period be held open to allow parties to respond to materials submitted on the last day). The council members stated the reasons behind their decisions and, while it seems that the Roth Report was considered, there was no evidence in the record suggesting that Roth's advice was based upon evidence outside the record. Therefore, even though we find that the council waived its privilege, we find that the Board's ruling on the Roth Report was harmless error, as the report appears to be nothing more than an additional memorandum of recommendations by another attorney. See *Newton v. Meissner*, 76 Ill. App. 3d 479, 499 (1979) (finding reversal not necessary where trial court erred in excluding evidence that was not covered by attorney-client privilege, because the plaintiff was not prejudiced by the error).

¶ 70 Fox Moraine next argues that the Board erred by invoking the deliberative process privilege, thereby denying Fox Moraine the opportunity to seriously inquire into bias on the part of the council members. Fox Moraine argues that the Board has repeatedly misapplied this "nonexistent" privilege, citing to *People ex rel. Birkett v. City of Chicago*, 184 Ill. 2d 521, 525 (1998), for the proposition that the privilege is not recognized. In *Birkett*, the plaintiffs (Du Page County, several municipalities, and the Du Page County State's Attorney) sought documents from the defendant, the City of Chicago, related to the expansion of O'Hare Airport. *Id.* at 523. The defendant objected, arguing that the documents were immune from discovery under the "deliberative process privilege." *Id.* at 526. The supreme court acknowledged that the deliberative process privilege was widely recognized in federal courts, protecting certain classes of intra-agency communications offered in the course of governmental decision-making. *Id.* The rationale for the privilege is to ensure the frank exchange of advice and opinions in the course of governmental decision-making and policymaking. *Id.* at 527. The controversial nature of this privilege arises from the privilege's implications, including its work against the truth-seeking function of legal proceedings, its power to undermine the public trust when the government seeks shelter under it, and its aim of fostering effective and efficient government decision-making by fostering candor among government staff. *Id.* at 527-28. The supreme court determined that adoption of the privilege for municipalities "should be left to the General Assembly," given the competing policies it raises. *Id.* at 533.

¶ 71 In *Thomas v. Page*, 361 Ill. App. 3d 484, 487-88 (2005), a supreme court justice filed a

defamation claim against a newspaper, which then subpoenaed several justices and their law clerks, seeking documents related to the case that was the subject of articles in the newspaper. The appellate court noted that "[i]t is well-settled that a judge may not be asked to testify as to his or her mental impressions or processes in reaching a judicial decision." *Id.* at 488. The issue before the court, however, was whether Illinois recognized a privilege protecting judicial deliberations and, if so, the scope. *Id.* The appellate court agreed that a limited judicial-deliberation privilege exists and protects against the disclosure of communications that meet a four-part test: (1) the communications must originate in a confidence that they will not be disclosed; (2) this element of confidentiality must be essential to the full and satisfactory maintenance of the relations between the parties; (3) the relation must be one that in the opinion of the community ought to be sedulously fostered; and (4) the injury that would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation. *Id.* at 489. The appellate court determined that the holding in *Birkett* did not apply because in *Birkett* the supreme court declined to recognize a deliberative process privilege for another branch of government. *Id.* at 491. "Rather, the judiciary, as a co-equal branch of government, supreme within its own assigned area of constitutional duties, is being asked to exercise its inherent authority to protect the integrity of its own decision-making process." *Id.* The court extended the privilege to the justices' law clerks and deemed it an absolute privilege. *Id.* at 493-94.

¶ 72    The Board stated in its opinion that there must be a strong showing of bad faith or improper behavior before any inquiry into the decision-making process may be made. The Board did not find the evidence sufficient to demonstrate bad faith or unalterably closed minds. The Board stated that, while some of the aldermen expressed opinions on the annexation, the "record contains no such statements about the landfill siting application." Additionally, the Board did not find that the actions of the council members running for election rose to the level of bad faith such that it would depart from protecting the decision-makers with the deliberative process privilege. Fox Moraine argues that *Thomas* and *Birkett* provide *only* that judges, and not members of other branches of government, may be protected by this privilege. We are inclined to agree with Fox Moraine that, while the council members were definitely acting in a quasi-judicial and quasi-legislative role, the supreme court's holding in *Birkett* and the narrow holding in *Thomas* would not warrant us extending this privilege to the council.

¶ 73    However, Fox Moraine did not seek production of documents; it sought to have the council members testify regarding their processes in reaching their decisions, which, as *Thomas* pointed out, is not allowable in well-settled law. The privilege recognized in *Thomas* applies to discovery of certain types of communications or documents, not to testimony of the mental impressions of judges. Moreover, Fox Moraine does not specify what questions it was erroneously barred from asking. The record was filled with objections that were sustained under this privilege and to examine each and every one would be burdensome. Generally speaking, Fox Moraine sought to question the aldermen on comments they made during the deliberations meeting. In our view, the comments speak for themselves and did not require further inquiry. Therefore, we agree with the Board's decision to bar inquiry into

the council members' mental impressions but note that the Board's rationale invoking the deliberative process privilege under these facts is misplaced.

¶ 74    Moving on, Fox Moraine argues bias and prejudgment of the application as to Burd, Spears, Sutcliff, Werderich, and Plocher. The Board reviewed these allegations as to Burd, Spears, and Sutcliff. As to Werderich and Plocher, the Board determined that, because Fox Moraine had knowledge of their potential bias, it forfeited this argument by failing to raise the issue promptly during the original siting proceeding. The Board determined that Fox Moraine's arguments related to Werderich's and Plocher's involvement in FOGY and their antilandfill activities at council meetings, which predated the election, and that therefore Fox Moraine had knowledge of their potential bias prior to the council's decision. The Board acknowledged that Fox Moraine had no formal "mechanism for objection," because the public hearings had closed. However, the Board was "unconvinced that an objection to the new council members could not have been made at the May 23, 2007 council meeting."

¶ 75    Accepting the Board's reasoning that Fox Moraine could have objected at the May 23, 2007, council meeting, the law is clear that a claim of disqualifying bias must be raised at the original proceeding. *E&E Hauling, Inc. v. Pollution Control Board*, 107 Ill. 2d 33, 38-39 (1985); *Peoria Disposal*, 385 Ill. App. 3d at 798; *Waste Management of Illinois, Inc.*, 175 Ill. App. 3d at 1038. Fox Moraine argues that the Board erred in finding forfeiture, because Werderich and Plocher were not seated until after the public hearing was closed. At the start of deliberations, Roth stated that no further input from Fox Moraine or the public would be allowed. Fox Moraine argues that, because it was not permitted to speak at the May 23 meeting, it could not object. Even if it could, it was not aware of some relevant facts until sometime later. We agree that Fox Moraine could have submitted a written motion immediately after the election, during the public commentary period or at the deliberations meeting. Since it made no attempt, we agree with the Board that the arguments were forfeited.

¶ 76    Alternatively, Fox Moraine argues that the Board should have considered its arguments despite forfeiture, "wherein injustice might otherwise result." *E&E Hauling, Inc. v. Pollution Control Board*, 116 Ill. App. 3d 586, 593 (1983). Fox Moraine makes this argument in a two-sentence paragraph in its brief; however, we will address it. In *E&E Hauling*, the village argued that the county board suffered from a disqualifying conflict of interest where all members, by virtue of their positions on the Forest Preserve District, a co-applicant for a landfill expansion, had financial interests in the approval of the landfill expansion and where the members, in their capacities as district commissioners, had passed favorably on the merits of the application prior to the public hearings. *Id.* at 592. The village did not raise these arguments during the hearings, but the court determined that the seriousness of the allegations impelled it to consider the merits. *Id.* at 593. The allegations in this case do not suggest bias as certainly as did the financial interests and dual roles of the county board members in *E&E Hauling*. Other cases have also held that similar allegations did not render proceedings fundamentally unfair. See *Waste Management*, 175 Ill. App. 3d 1023 (finding no prejudice shown where statements opposing the landfill, including a statement opposing the landfill and favoring recycling methods of disposal, did not show that the member prejudged the application); *Waste Management of Illinois, Inc. v. Pollution Control Board*,

123 Ill. App. 3d 1075 (1984) (appellate court noted that the applicant's argument that half the board faced re-election shortly after the date of the decision was insufficient to establish a biased decision-making process, even where there was strong public opposition). Here, Werderich's and Plocher's conduct indicated that they were not in support of the landfill, but their comments did not indicate that they would vote without considering the evidence if placed in such a position. Because we do not find the allegations pertaining to Werderich and Plocher to be so certain, as was the financial conflict of interest in *E&E Hauling*, we find no reason to review the issue despite forfeiture.

¶ 77    Next, Fox Moraine argues that Burd "seized upon the public opposition to the landfill as a way to get herself elected as mayor," utilizing the assistance of FOGY members on her campaign and, immediately after the election, hiring Roth to prepare a report recommending denial of the application. Fox Moraine also argues that Burd hastened the vote to force a premature decision, denying the aldermen an opportunity to review the new materials. The Board agreed that Burd had landfill opponents on her campaign committee but noted that the record "contained no evidence of statements opposing the landfill being made by council members voting on the application." The Board did not make any other specific findings on Burd.

¶ 78    First, we must draw attention to the fact that, as mayor, Burd did not vote in this matter, only the aldermen voted. While we agree with Fox Moraine that Burd's testimony of being "unaware" that many of her campaign committee members were outspoken landfill opponents is incredible, we do not see how her potential bias would affect Fox Moraine when she had no vote in the matter. Second, regarding the allegation of Burd's collusion with Roth, there was nothing in the record to support Fox Moraine's argument that Burd hired Roth in order to have him write a recommendation to deny the application. Burd testified that she interviewed Roth, along with other attorneys, prior to being sworn in as mayor and advised Roth that she would be recommending him once she was sworn in. She was within her authority to replace the city attorney subject to approval by the city council. Fox Moraine argues that Wildman Harrold billed Yorkville as early as April 27, 2007, before Burd was sworn in on May 8. However, Burd testified that she did not tell Roth to begin work then. While she admitted that the city was billed for Roth's time spent prior to his official appointment as city attorney, whether Yorkville should pay those bills is another matter. Wildman Harrold's decision to begin work on a time-sensitive matter *in anticipation* of Roth's official appointment approximately one week later does not establish that Burd colluded with Roth to support denial of Fox Moraine's application.

¶ 79    Third, Fox Moraine argues that Burd rushed the final vote. Undisputedly, the city council had only days to rule on the application before it would be statutorily deemed approved. While numerous documents were filed on the last day of the public commentary period, fundamental fairness has been held to require only that the record be made available for review by the entire council prior to voting. See *Waste Management*, 175 Ill. App. 3d at 1044. In *City of Rockford v. County of Winnebago*, 186 Ill. App. 3d 303, 311-12 (1989), the city argued that a number of the county board members had testified to varying degrees of unfamiliarity with the record or even to having no knowledge of the record's existence. The appellate court stated that the only statutory requirement concerning the decision of a county

-23-

board is that its decision be in writing and specify the reason for the decision. *Id.* at 313 (citing *Waste Management*, 175 Ill. App. 3d at 1044). The court found that testimony from other witnesses established that the record was available to the board members. *Id.* The court stated that "[w]hether the board members availed themselves of the opportunity to review the record is not an issue relevant to this case, as there is no such requirement that they do so." *Id.* Likewise, in this case, the council members received over 1,000 pages of materials submitted by Fox Moraine, members of the public, Clark, Roth, and Price. The council members voted to hold off voting so that members could review the materials. For the council members to *actually* review the materials in their entirety was not statutorily required; fundamental fairness required only that the materials be made available, and they were. Burd did not prevent the council members from reviewing the materials, as the members voted to hold off the actual vote until the next night to afford time to review the materials.

¶ 80 Next, Fox Moraine argues that Spears was biased because she based her decision on matters outside of the record. It argues that Spears conducted her own research, because she "claimed that vinyl chloride, found in some landfills, has no known safe level for humans" and that the design was unsafe without a double composite liner system with a leak detection component, and because Burd singled out Spears for her "great" research. Fox Moraine contends that there was no evidence in the record that supported her comment regarding vinyl chloride and that the evidence showed that Fox Moraine's design was superior to the double composite liner system that Spears mentioned. We have painstakingly reviewed the record and find no evidence that Spears performed independent research beyond the evidence in the record, other than in her questioning of the traffic engineer, during which Clark admonished Spears that she could not question the witnesses on matters outside the record. While Spears might not have summarized certain aspects of the criteria entirely correctly, there is nothing to suggest that Spears relied on materials outside the record in reaching her conclusions. Fox Moraine's allegation that Spears received *ex parte* communications, which caused her to prejudge the application, is also without merit. It was clear that the public opposed the landfill, and the law recognizes that some *ex parte* communications would be received. There is nothing in the record to suggest that the aldermen, including Spears, responded to any of the *ex parte* messages received from constituents or that the strong public opposition caused them to prejudge the application.

¶ 81 Regarding Sutcliff, the Board determined that she was well within her rights to run for office based on dissatisfaction with the performance of the current elected officials. The Board noted that Sutcliff had a website and that she "adamantly maintained she was merely reporting the proceedings." Upon learning of the fact that she might be participating in the vote, she withdrew the website and stopped distributing her antilandfill campaign materials. The Board found that "these activities do not establish bias." However, Sutcliff's materials and her own testimony establish that she had determined prior to any of the hearings that the landfill should not be built in Yorkville, that she ran for council because she felt that the current officials were trying to get the landfill in the city, and that she removed antilandfill materials only after being told about the rules. Mere removal of the materials does not prove that the demonstrated bias was removed. We find questionable the Board's decision that the

-24-

evidence did not show that Sutcliff prejudged the landfill application. Had we not found forfeiture to apply to Werderich and Plocher, we might also have found the Board's decision questionable as to Plocher. Plocher's statements, made during deliberations and in public, indicating that he could not vote in favor of a landfill because of "cross-contamination" and leakage, do not accurately reflect the statutory criteria. Similarly, materials Sutcliff distributed and posted on her website and statements she made during deliberations indicate that she did not review the application based on the statutory criteria, as she stated that there was no way a landfill could be designed to minimize the effect on property values.

¶ 82    The parties have not discussed the possible remedies for finding Sutcliff (or even Werderich and Plocher) biased. Fox Moraine argues that reversal would be required. We disagree, as reversing, and thus allowing the application to be approved, would be a harsh result for the conduct of certain council members where the remaining council members conducted themselves appropriately. Rather, the Board could have disqualified Sutcliff. See *City of Rockford*, 186 Ill. App. 3d at 307 (citing to underlying Board order disqualifying certain members from voting on remand); *City of Rockford v. Winnebago County Board*, Ill. Pollution Control Board Op. No. 87-92 (Nov. 19, 1987) (the Board disqualified four council members from participating on remand, because they wore antilandfill buttons at one of the hearings; the Board found county's decision fundamentally unfair due to the nature, extent, and effect of *ex parte* contacts, remanding so that the substance of the contacts could be put on the record, and because county board members specifically stated on the record that they had considered evidence outside the record).

¶ 83    In *City of Rockford v. Winnebago County Board*, the Board declined to reverse the county board and approve the application and instead vacated and remanded with instructions that four county board members be disqualified, the substance of *ex parte* contacts at issue be made part of the record and subject to an additional hearing, and that the board render a decision based exclusively on the criteria. *City of Rockford*, slip order at 31. Here, like in *City of Rockford*, the record was complete and developed in a fundamentally fair manner. The facts of our case are not as egregious as those in *City of Rockford.* Unlike in *City of Rockford*, the council members here did not openly state that they considered evidence outside the record. Additionally, *ex parte* contacts did not rise to the level found in *City of Rockford*, where county board members discussed the landfill on a radio program, did not attempt to limit their discussions with the public, read letters supporting one party over another that were not placed in evidence, had telephone conversations about the merits with constituents, and bought refreshments during hearings from the citizens' group opposing the landfill. In our case, while the fact that Plocher and Sutcliff made comments and distributed materials could cause a disinterested observer to conclude that neither would vote in favor of any landfill application, the remaining council members testified that they handed out preprinted cards advising constituents that they could not discuss the landfill, did not respond to e-mails or phone calls about the landfill, listened to the evidence adduced at the hearings, which were conducted in a fundamentally fair manner, and did not participate in or attend

FOGY meetings or otherwise show support for FOGY.[6]

¶ 84    Unlike in *City of Rockford*, the Board's order in this case is virtually void of any critical analysis, and we are left to ponder how the Board reached its conclusions. While we find its conclusion as to Sutcliff questionable, we do not find that the Board's decision was clearly erroneous. Even if we did find that the Board erred in finding that Sutcliff was not biased, we ultimately agree that the proceedings were fundamentally fair, and the appropriate remedy would have been disqualifying Sutcliff. Disqualifying Sutcliff (and even Plocher and Werderich for that matter) would still leave a majority of the council members voting against the application.

¶ 85    Thus, we find that the Board erred in denying Fox Moraine's motion to compel disclosure of the Roth Report, because the record reflects that the council waived its attorney-client privilege. However, that error was harmless. We also find that the Board properly denied Fox Moraine's attempts to inquire into the council members' mental impressions regarding their decisions. Finally, we find that the Board properly rejected Fox Moraine's fundamental fairness argument.

¶ 86                                    C. The Siting Criteria

¶ 87    Fox Moraine argues that the city council's findings on the Act's siting criteria were against the manifest weight of the evidence. We review the Board's decision to affirm the city council under the manifest-weight-of-the-evidence standard. 415 ILCS 5/41(b) (West 2006); *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 119, 123 (2007).

¶ 88    Fox Moraine first argues that the Board failed to utilize its expertise when it considered the evidence. Fox Moraine argues that *Town & Country*, 225 Ill. 2d at 120-23, requires the Board's "technically qualified members to conduct a 'hearing' " and assess the evidence and the weight to be placed on the evidence. Fox Moraine argues that the Board failed to apply its technical expertise in examining the record to determine whether the record supported the city council's conclusions. See *Town & Country*, 225 Ill. 2d at 123 (explaining that, while the Board is confined to the record of the underlying proceedings rather than preparing its own record, this does not render the Board's technical expertise irrelevant; rather, the Board should apply its technical expertise in examining the record to determine whether the record supports the siting authority's conclusions). At oral argument, Fox Moraine argued that *Town & Country* changed the Board's standard of review to require something less than *de novo* but more than the manifest weight of the evidence. We disagree that the holding in *Town & Country* provides a different standard of review. Rather, the Board is to review the siting authority's decision under the manifest-weight-of-the-evidence standard and is not to reweigh the evidence. *Town & Country* did not hold differently; it held that a reviewing court is to review the Board's decision and give deference to that decision, not to the siting

_____

[6]While Werderich started FOGY, he resigned shortly after deciding to run for the aldermanic seat, and his campaign materials merely stated that he was the first to question the annexation proceedings. Unlike Sutcliff, Werderich did not promise to vote against the landfill.

-26-

authority's decision. *Town & Country*, 225 Ill. 2d at 118. It also held that the Board was not required to create its own record but to consider the record prepared by the siting authority and use its expertise in reviewing that record. *Id.* at 123.

¶ 89    Our review of the record reveals that the Board used its expertise in reviewing the evidence to determine whether it supported the council's conclusions. The council, not the Board, had the duty to resolve conflicts in evidence. With that being said, we do agree with Fox Moraine that in its decision the Board spent more time summarizing the arguments of the parties than it did analyzing those arguments in any usable legal framework. However, we do not find that the Board abrogated its duty to use its expertise in reviewing the record. Thus, we reject Fox Moraine's allegation that the Board failed to apply its expertise in examining the record, and we will review whether the Board's decision was against the manifest weight of the evidence.

¶ 90    While the Board is required to review the siting authority's findings on each criterion, a negative finding as to one of the criteria is sufficient to defeat an application. *City of Rockford*, 186 Ill. App. 3d at 316. Accordingly, we can confirm the Board's decision based on any one of the criteria. See *Town & Country*, 225 Ill. 2d at 125.

¶ 91                                    1. Criterion (ii)

¶ 92    We find that the Board's decision that Fox Moraine failed to meet criterion (ii) was not against the manifest weight of the evidence. Criterion (ii) requires that "the facility is so designed, located and proposed to be operated that the public health, safety and welfare will be protected." In considering this criterion, the siting authority may also consider the "tenth criterion," which is the applicant's previous operating experience and past record of convictions or admitted violations in the field of solid waste management.

¶ 93    Daniel Drommerhausen, a professional geologist with Shaw Environmental, testified regarding criterion (ii) on behalf of Fox Moraine. Drommerhausen's expertise was in hydrogeology, and he had worked on over 20 landfill projects over the years. Drommerhausen explained that geology deals with the underlying soils and bedrock, and hydrogeology deals with how the groundwater moves through those geologic units. After Drommerhausen explained his geological testing procedures and protocol, he testified that there was 80 feet of low-permeability clay between the base of the proposed landfill and the base of the "Lemont formation," which is a glacial till or clay formation. Drommerhausen stated that basically there was 80 feet of clay, making the location a good site because the clay would act as a natural barrier. The clay, Drommerhausen stated, exceeded by 83% the Illinois Environmental Protection Agency's (EPA) permeability requirements for a landfill liner system. Further, Drommerhausen testified that there was no earthquake threat to the area because the Sandwich fault line had not had any measurable displacement in over 286 million years. Regardless, modern landfills, according to Drommerhausen, have performed extremely well in major earthquake events. Moving on to the hydrogeology of the site, Drommerhausen defined an aquifer as a geologic unit with high enough permeability to supply water to a private water well. At the proposed site, the Lemont formation was the uppermost aquifer and it would effectively restrict vertical and horizontal movement of

-27-

groundwater, providing the site with an additional safeguard. Based on these natural characteristics of the site, Drommerhausen performed analyses, first assuming that the landfill would have no liner system. The site passed "quite adequately" based on only the natural characteristics, meaning that the groundwater would be protected by the Lemont formation should the landfill leak. The proposed landfill was designed to have a protective liner system in place in addition to the natural protective characteristics of the site. Thus, Drommerhausen opined, the site was located hydrogeologically so as to protect the public health, safety, and welfare.

¶ 94 Moose also testified for Fox Moraine regarding criterion (ii). Moose had extensive experience and education in landfill siting, design, and permitting. Moose recommended the proposed site to Hamman because it had been considered by other companies in the previous 10 years and he knew that it had excellent geology. The location also had a low population density and was set back from the Fox River and wooded areas such as Jellystone Park. Like Drommerhausen, Moose testified that the land was not in an active seismic area. He went on to discuss the design of the landfill. First, Moose addressed the two sources of possible contamination that a landfill poses: leachate, which is anything that touches garbage; and landfill gas, which is caused by the natural decomposition of garbage and often contains methane. The composite liner system that Moose designed was far beyond what the site needed or the statute required, according to Moose, because the natural clay formation was sufficient. In his system, first a layer of high-density polyethylene liner is put on top of three feet of compacted clay. On top of that liner system is a leachate collection system, which is a granular drainage layer. Moose went on to explain the protective layered liner system designed for the area where the leachate would collect. Moose then explained the gas collection system, which would remove the gas from the landfill. He explained the use of isolated flares to incinerate the gas, which would be done in an enclosed manner to eliminate odor. The gas would then be converted to electricity and used, reducing greenhouse gases. Moose continued, explaining the plan for a monitoring system that would sound an alarm if anything is not working according to the system's plan. The alarm system was designed to provide early warnings to prevent leachate or gas issues before an actual failure in the system would occur. He also explained various procedures to inspect and screen waste deliveries to prevent problems.

¶ 95 Moose admitted on cross-examination that the siting application proposed moving a tributary to the Hollenbeck Creek, that the Army Corps of Engineers had requested additional information, and that other groups opposed moving the tributary and had asked for an alternative site study. Moose testified that he would not do further studies unless the application was approved, because it "did not make sense for us to invest that time and energy with everybody if we are unsuccessful at this level." He also admitted that the landfill was designed under the assumption that Sleepy Hollow Road would be vacated.

¶ 96 During public commentary, Ludwikowski spoke out critiquing the design of the landfill. Ludwikowski believed that the design did not contain an appropriate number and placement of monitoring wells. He had obtained a report from Dennis Palumbo, a retired hydrogeologist, who confirmed his concerns and had additional concerns. Palumbo's report was submitted into evidence. Ludwikowski spoke with Illinois EPA geologists, who told him

that the design would not be approved without the proper downgradient monitoring wells. He expressed concern that if the city council approved the design now, and the design was changed based on the EPA's approval process, the public and the council might not have an opportunity to review the new design. Moose agreed to modify positioning of some of the wells, based on Ludwikowski's comments.

¶ 97    FOGY called Schmanski, a civil engineer with an environmental emphasis, including on drainage-related projects. He reviewed the storm water management aspects of Fox Moraine's application and concluded that the portion of the facility exceeded the regulatory discharge rates for storm water management in Yorkville. The north basin would take much more water than regulations would allow. Regulation of storm water is generally based on what creeks can take without running over their banks. With the current drainage system design, the creek in the area would run at a level higher than what regulations allow. On cross-examination, Schmanski admitted that he had never performed storm water drainage reviews for landfills or for landfill siting applications. He was aware that the Illinois EPA's storm water regulations for landfills are different from municipal ordinances. Regardless, Schmanski recommended that Fox Moraine modify its existing drainage plan to more evenly distribute the storm water among the different basins.

¶ 98    FOGY also called Joyce Blumenshine, a retired librarian and an antilandfill expansion activist from Peoria. The relevance of her testimony was unclear, but she did not agree with the proposed expansion of the Peoria Disposal landfill because she believed that the operators, who would also operate Fox Moraine's landfill, were "liars" about contamination at the site. Her testimony was not backed up by any facts relevant to the Fox Moraine application.

¶ 99    Ron Edwards testified for Fox Moraine regarding the tenth criterion. Edwards was currently a manager of the Peoria Disposal Company and Fox Valley LLC, which had contracted with Fox Moraine to operate the proposed facility. Edwards was a state-certified landfill operator with more than 23 years of experience in the management of solid waste. Edwards managed the Peoria Disposal Company and he discussed its compliance standards and past record, given that Fox Valley LLC would similarly operate the proposed facility. According to Edwards, Peoria Disposal had about 350 Illinois EPA inspections over the past 14 years without a violation. Peoria Disposal had been awarded for its consistently positive performance. Other facilities operated by Peoria Disposal included sites at Washington, Pike County, Indian Creek, and Clinton. Edwards described the violations from the various facilities, using PowerPoint slides: at Peoria, 1991, failed to cover and label containers ($15,000 penalty); 1985, operated a land stabilization field in violation of the Act ($45,000 penalty); 1989 and 1988, exposed refuse and received special waste without permit ($500 penalty each); at Washington, 2002, sign violation that was dismissed; at Pike, 1988, two $500 penalties for exposed refuse and failure to collect litter and five allegations dismissed without penalty; Indian Creek had no violations; at Clinton, 1993, two $500 penalties for exposed refuse and leachate seepage; 1989, two $500 violations for exposed refuse and refuse in standing water; and over a 10-year period, five alleged administrative violations that were dismissed without penalties. Additionally, in 2001, there was an alleged violation at Clinton for receiving hazardous waste. Edwards stated that it was resolved by settlement

through a process known as the Supplemental Environmental Project. Edwards explained that the facility had accepted an unopened container, which, upon the facility's inspection, was returned because it contained a hazardous material. Clinton had in place a policy of inspecting 10% of all unopened materials but then changed it to a 100% inspection policy. This 100% inspection policy would be implemented at Fox Moraine's facility. Edwards further explained the company's experience and protocol in compliance procedures.

¶ 100    On cross-examination, Edwards admitted that Fox Valley LLC itself had no prior landfill operation experience because it was a newly formed limited liability company. He admitted that Hamman also had no prior landfill operation history. Edwards explained that the individuals comprising Fox Valley LLC had worked with the Peoria Disposal Company and would be responsible for operating the landfill, although Fox Moraine would have an owner-representative on site as well. Edwards admitted that the proposed landfill would be the largest of the landfills he would currently operate. On questioning from Burd, Edwards explained that the Peoria Disposal Company was a 20% owner of Fox Valley LLC. When asked whether a minority owner would have enough control over Fox Valley LLC to ensure conformance with the standards at which Peoria Disposal was run, Edwards stated, "absolutely," because Peoria Disposal was providing a $500,000 guarantee to ensure correct performance of the conditions in the contract and operation of the facility, in addition to a $200,000 performance bond. Fox Moraine and Fox Valley LLC did not have a relationship between owners.

¶ 101    The Board determined that there was evidence in the record supporting Yorkville's decision as to criteria (ii) and (v) given the question about relocation of the tributary to the Hollenbeck Creek, the numerous conditions that Price proposed regarding the liner system, and the uncertainty regarding the facility's operator, because Hamman was Fox Moraine's majority owner but Fox Valley LLC would be the operator. Further, Peoria Disposal's other facilities had some infractions in the past.

¶ 102    It has been held that a determination on the second criterion is purely a matter of assessing the credibility of the expert witnesses. *File v. D&L Landfill, Inc.*, 219 Ill. App. 3d 897, 907 (1991). Here, the Board considered Moose's testimony that Fox Moraine had not addressed the issue of relocating the tributary, which the Army Corps of Engineers had identified as problematic. At oral argument, Fox Moraine argued that the landfill design's effect on the Hollenbeck Creek was not a factor for the city council because that aspect would be addressed with the Illinois EPA. We disagree that the city council could not consider this fact when considering the effect of the landfill's design on the creek surrounding the property. While the Board related the impact on the creek to criteria (ii) and (v), it appears that relocating a creek would more logically factor into criteria (ii) and (iii).[7] Regardless, the issue with Hollenbeck Creek was problematic.

_____

[7]Relocating a creek would likely disturb the wildlife and natural creek flow, which seemingly would impact the public welfare (criterion (ii)) and the compatibility of the landfill with the character of the surrounding area (criterion (iii)) rather than the danger of fires or spills (criterion (v)).

¶ 103    Additionally, Edwards testified to the various infractions at other facilities operated by Peoria Disposal. Further, the relationship among Peoria Disposal, Fox Valley LLC, and Fox Moraine was uncertain. While Clark noted in his report that Peoria Disposal's infractions were all relatively minor, the record also reflects some uncertainty as to the operator and control of the proposed facility, as Hamman was Fox Moraine's majority owner. Hamman had no history operating a landfill, and there was a question as to Peoria Disposal's ability to control operations. Thus, the Board's decision to affirm on criterion (ii), and further on criterion (iii), was not against the manifest weight of the evidence.

¶ 104    We also agree that criterion (viii) was not met. Fox Moraine contends that criterion (viii) applies only if a proposed facility is to be located in a "county," a term that includes only unincorporated land (see 415 ILCS 10/2(4)(2) (West 2006)). Because Fox Moraine sought approval for siting within Yorkville's city limits, it argues that the county's solid waste management plan did not apply. We reject Fox Moraine's interpretation of criterion (viii). Its plain language indicates that it is inapplicable to a proposed site in a county with a population of less than 100,000, which is exempt from the Solid Waste Planning and Recycling Act (Solid Waste Act) (415 ILCS 15/1 *et. seq.* (West 2006)), or in a county that has not yet filed a plan. We therefore agree with the Board that criterion (viii) is applicable.

¶ 105    Kendall County and the Board contend that the county's May 2006 amendment to its "Kendall County Solid Waste Management Plan," created pursuant to the Solid Waste Act, provided that landfills could be sited only within unincorporated areas of the county. According to Kendall County, the Solid Waste Act grants to counties more control to manage the siting of landfills. Thus, Kendall County argues that Fox Moraine failed to meet criterion (viii) because siting the facility within the city limits of Yorkville would violate the county's solid waste plan. Yorkville agrees with Kendall County and does not argue that the May 2006 amendment was improperly added to the county plan. Fox Moraine argues that the amendment is inconsistent with the Local Solid Waste Disposal Act (Local Solid Waste Act) (415 ILCS 10/2(4)(1) (West 2006) (defining jurisdiction to include both municipalities and counties)), which recognizes a municipality's jurisdiction to site a landfill within its territory. In its decision on this issue, the Board stated that section 40.1 of the Act limited its authority to review the council's decision under section 39.2 of the Act. The Board stated that it "does not review the contents of the solid waste management plan for consistency with the law" and that thus it did not consider whether the amendment improperly usurped the right of a municipality to site a landfill.

¶ 106    In *County of Kankakee v. Pollution Control Board*, 396 Ill. App. 3d 1000, 1024 (2009), a similar situation arose. The appellate court held that the applicants did not have standing to attack the propriety of the county's amendment to its solid waste plan and that the city did not raise the issue, and it therefore could not address the propriety of the county's amendment. Arguably, Yorkville would have a valid objection to Kendall County's amendment, which apparently was enacted without Yorkville's consent. See 415 ILCS 10/2(2) (West 2006) (recognizing that municipalities have some ability to plan for disposal of solid waste); 415 ILCS 15/2(a) (West 2006) (stating that solid waste planning should be encouraged to take place through inter-governmental cooperation agreements whereby various units of local government determine the best methods and locations for disposal of

-31-

solid waste and whereby the Solid Waste Act shall not be construed to impact authority of local units of government in the siting of solid waste disposal facilities); 415 ILCS 15/5(a) through (c) (West 2006) (requiring county to form advisory committee with representatives from municipalities in drafting a plan, to provide written notice to municipalities and members of public when plan development begins, and to submit copies of the proposed plan to the Illinois EPA, municipalities, and other agencies for comment). However, like the municipality in *County of Kankakee*, Yorkville does not argue that the amendment improperly removed its authority to site a landfill within its city limits. Therefore, we need not address the propriety of the amendment.[8]

¶ 107      The record also does not reflect whether the Illinois EPA rejected or approved or otherwise commented on the amendment. The Board made no mention of these issues but simply reviewed the amendment as if it were valid. Without any evidence to the contrary, like the Board, we are left with Kendall County's solid waste management plan amendment, which usurped the right of any municipality in Kendall County to site a solid waste management facility.

¶ 108      Fox Moraine argues that, even accepting the amendment, it met criterion (viii) because it "located" the landfill while the land was in unincorporated Kendall County. Fox Moraine argues that Walter Willis, a senior waste management planner with 20 years' experience, testified that Fox Moraine "located" the site while the land was unincorporated and thus it satisfied the county plan's requirement that landfills be located on unincorporated land. Fox Moraine argues that this is so because it negotiated the host agreement with Yorkville before it annexed the property. We agree with the Board and Yorkville that Fox Moraine's interpretation of the amendment's use of the word "located" is a strained one. We do not believe that the plan's language is ambiguous or that it lends to this interpretation. The Board determined that the "evidence supports Yorkville's reading of the resolution." Because the plan, right or wrong, unambiguously provided that no landfill could be located on incorporated land and there was no evidence that the amendment was invalid when Fox Moraine filed its application, the Board's decision that Fox Moraine failed to meet criterion (viii) was not against the manifest weight of the evidence.

¶ 109      While we need not review the remaining criteria, we will briefly comment on them, given that the Board's decision deprived the parties of any meaningful analysis. On criterion (i), which considers whether the proposed facility is necessary to accommodate the waste needs of the area it is intended to serve, Fox Moraine presented Philip Kowalski, a solid waste planner with Shaw Environmental. Kowalski first performed a needs analysis to determine the demand for waste disposal and the capacity and number of current landfill facilities. According to Kowalski, the service area had recently seen several landfills close such that at one point there were 28 landfills operating and in 2006 there were 10. A few others still

_____

[8]We wonder, if Yorkville agreed with Kendall County's action, why it conducted the siting application hearings in the first place. While prior to the proceedings there was some debate on whether Yorkville had the authority to site the landfill, the record does not reflect that any party took action to resolve this legal issue prior to undertaking the lengthy and extensive siting process.

in operation had limited capacity or the ability to accept limited types of waste. Thus, in Kowalski's opinion, the intended service area was in need of a landfill because capacity of all landfills serving the area would be exhausted by 2016 or 2017. It would take eight to nine years from when a landfill is conceptualized until it could accept waste, so Kowalski believed that siting a landfill now was urgent. He admitted that the proposed landfill would be handling only a small fraction of the service area's waste needs and that approximately 80% would still be shipped out to other landfills.

¶ 110　　　The city council determined that there was no need for a new facility in the service area because landfill capacity that could meet the needs for another eight to nine years was still available in Illinois, Indiana, Wisconsin, and Michigan. The Board agreed that the evidence in the record demonstrated that landfill capacity was available and that mere convenience was insufficient to establish the need. The Board may consider the existing landfill space both within and outside the county. On this criterion, we question the Board's conclusion, as there was no opposing evidence that refuted the need for a new landfill. Our review demonstrates that Hyink presented information, which he found on the Internet and through the Illinois EPA, during the public commentary portion of the proceedings to argue that the area did not need another landfill. Fox Moraine adequately cross-examined Hyink after it objected to him "testifying" as an expert during the public commentary period. No reliable evidence was presented refuting the need for the landfill. Although an applicant need not show absolute necessity, it must demonstrate an urgent need for the new facility as well as the reasonable convenience of establishing it. *Waste Management*, 175 Ill. App. 3d at 1031. The applicant must show that the landfill is reasonably required by the waste needs of the area, including consideration of its waste production and disposal capabilities. *Id.* Here, while the landfills currently within and outside Kendall County have capacity for approximately another decade, the Board did not factor in the fact that, from its conception, it would take nearly eight years before the landfill would be ready to accept waste.

¶ 111　　　Regarding criterion (iii), which requires that the facility is located to minimize incompatibility with the character of the surrounding area and to minimize the effect on the value of the surrounding property, Christopher Lannert, a land use planner and landscape architect, testified for Fox Moraine. Lannert studied the approximately 13,000 acres surrounding the proposed landfill, noting that the predominant use of the land was agricultural. Smaller percentages of the land were used for residential and commercial or industrial uses. Lannert testified that the landfill itself was designed to conform with the natural undulations of the land, picking up the natural landscape features. Lannert selected trees, grasses, and other vegetation that were native to the Yorkville area to design the landscape of the area. In Lannert's professional opinion, the landfill site would minimize incompatibility with the surrounding area. He testified that he thought that future development would occur even with the landfill's presence, based on the fact that other areas with landfills have experienced similar growth, including Settler's Hill near Geneva and Prairie Crossing in Grayslake. As discussed, relocating the tributary to the Hollenbeck Creek was part of the landfill's design and was problematic. We cannot say that the Board was incorrect in affirming on criterion (iii), given that the Army Corps of Engineers found moving the tributary too disruptive to the environment.

¶ 112    Regarding criterion (iii), the Board determined that it was the city council's duty to weigh the evidence, resolve conflicts in testimony, and assess the credibility of the witnesses. It stated, "Merely because the Board could reach a different conclusion, is not sufficient to warrant reversal." While the applicant must establish that it has done or will do what is reasonably feasible to minimize incompatibility and impact on property values, the Act does not require a guarantee that there will be *no* incompatibility and impact on property values. *File*, 219 Ill. App. 3d at 907. While we agree that the finding on criterion (iii)'s compatibility requirement was not against the manifest weight of the evidence as it related to the Hollenbeck Creek, the finding on the impact on property values was more questionable. FOGY witnesses testified in terms that implied that Fox Moraine had to demonstrate that there would be *no impact* on the land and property values, which is not the statutory standard.

¶ 113    Regarding criteria (vi), minimizing the impact on existing traffic flows, Michael Werthmann, a traffic and transportation engineer, testified for Fox Moraine. Werthmann testified that Yorkville had four major arterial truck routes, Routes 47, 71, 126, and 34. Routes 47, 71, and 126 would be used to access the proposed landfill. His analyses concluded that 428 total truck trips could be expected on a maximum day, over a 12-hour period. According to Werthmann, the impact of this amount of traffic was minimal given the size of the parcel of land the landfill would occupy and that the traffic would be distributed over three major arterial roadways over the course of a 12-hour day. Access to the landfill was discussed with the Illinois Department of Transportation and it was determined that an access driveway to the landfill would best be situated off of Route 71. Werthmann noted that future road improvements would be necessary, including to Route 47, and that these improvements would be needed regardless of the landfill.

¶ 114    Brent Coulter, a traffic engineer, testified for Kendall County that Fox Moraine's proposal did not minimize the impact on existing traffic. Coulter opined that the amount of heavy truck trips per day that Werthmann anticipated would require regional expressway routes and not the roadways planned to be used. Coulter observed that many of the roads that the trucks would use would be two-lane highways with gravel shoulders, curves, and numerous no-passing zones. The landfill's distance from the major expressways, including I-88, I-55, and I-80, was roughly 20 miles. Coulter testified that the impact of the landfill traffic would adversely affect "sensitive use" areas, such as downtown Yorkville and downtown Plainfield.

¶ 115    The Village of Plainfield called Steve Corcoran, a traffic engineer, to testify regarding the proposed landfill's impact on downtown Plainfield. One of Plainfield's goals was to eliminate non-local traffic through its downtown area, as the routes were already at capacity for truck traffic. Corcoran calculated, based on Fox Moraine's estimated 374 to 428 truck trips per day, that downtown Plainfield would have 15 to 25 trucks per hour during rush-hour times. However, Plainfield did not necessarily oppose the landfill. Its objective was to minimize its impact on downtown Plainfield.

¶ 116    The Board determined that the record contained evidence to support the city council's finding on criterion (vi), primarily the evidence supplied by Coulter and Corcoran. The Board did not agree with Fox Moraine that Coulter and Corcoran did not understand that the standard was to minimize, not eliminate, the effect on traffic. Coulter had testified that

-34-

adding trucks to routes already designated "F" was not good for a location and that Werthmann should have examined the potential impact on residential areas. We again find the Board's analysis questionable. The Act does not require elimination of all traffic problems (*Tate v. Pollution Control Board*, 188 Ill. App. 3d 994, 1024 (1989)), nor is the applicant required to provide evidence of exact routes, types of traffic, noise, dust, or projections of volume and hours of traffic, because the Act does not require a traffic plan but rather a showing that the traffic patterns to and from the facility are designed to minimize impact on existing traffic flows (*Tate*, 188 Ill. App. 3d at 1024). See also *McHenry County Landfill, Inc. v. Environmental Protection Agency*, 154 Ill. App. 3d 89, 102 (1987) (traffic criterion was not established where the landfill's entrance design did not have a deceleration lane for trucks to make right turns into facility, where road's speed limit of 55 miles per hour was considered hazardous). Here, the entrance was designed to have right and left turn lanes for trucks to use and would also allow trucks to enter the facility at off-hours so that trucks could come after rush-hour times. Fox Moraine did not have to establish that every arterial road would not be affected, just that it designed the entrance to and from the facility to minimize the impact on the roadways. Downtown Plainfield is quite a distance from the planned landfill site (approximately 15 miles), and since Fox Moraine was not even required to submit planned traffic routes, we question the Board's analysis that Fox Moraine failed to demonstrate that the traffic patterns to and from the facility were designed to minimize the impact on the traffic flow around it.

¶ 117   While we have found some aspects of the Board's analysis questionable as to certain criteria, we reiterate that we may confirm the Board's decision if its finding as to one of the criteria was not against the manifest weight of the evidence. As we discussed, the Board's findings as to criteria (ii), (iii), and (viii) were not against the manifest weight of the evidence. We therefore confirm the judgment of the Board.

¶ 118                                    III. CONCLUSION

¶ 119   In conclusion, we find that the Board's denial of Fox Moraine's motion to compel disclosure of the Roth Report on the ground that it was privileged was harmless error; that the Board correctly limited inquiry into the city council member's mental impressions; that the Board was correct in finding that Fox Moraine forfeited its argument that Werderich and Plocher were biased; that the Board correctly rejected the remaining arguments as to fundamental fairness; that the Board applied the proper standard of review in reviewing the statutory criteria; and that the Board's finding that criteria (ii), (iii), and (viii) were not met was not against the manifest weight of the evidence. Accordingly, we confirm the judgment of the Board.

¶ 120   Confirmed.