# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Stop the Mega-Dump v. County Board*, 2012 IL App (2d) 110579

---

| | |
|---|---|
| Appellate Court Caption | STOP THE MEGA-DUMP, Petitioner, v. THE COUNTY BOARD OF DE KALB COUNTY, ILLINOIS, and WASTE MANAGEMENT OF ILLINOIS, INC., and THE ILLINOIS POLLUTION CONTROL BOARD, Respondents. |
| District & No. | Second District<br>Docket No. 2-11-0579 |
| Filed | October 29, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The Pollution Control Board's decision upholding respondent county board's approval of an application to expand a landfill was affirmed over petitioner's contentions that the hearing before the board was fundamentally unfair, that the tours of the applicant's other facilities provided to board members constituted improper *ex parte* communications, and that the board prejudged the application in the applicant's favor. |
| Decision Under Review | Petition for review of order of Pollution Control Board. |
| Judgment | Affirmed. |

Counsel on
Appeal

George Mueller, of Mueller Anderson & Associates, of Ottawa, for petitioner.

Clay Campbell, State's Attorney, of Sycamore (John E. Farrell, Assistant State's Attorney, of counsel), for respondent County Board of De Kalb County.

Pedersen & Houpt, P.C., of Chicago (Donald J. Moran and Lauren Blair, of counsel), for respondent Waste Management of Illinois, Inc.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Clifford W. Berlow, Assistant Attorney General), for respondent Pollution Control Board.

Panel

JUSTICE BURKE delivered the judgment of the court, with opinion.

Justices McLaren and Zenoff concurred in the judgment and opinion.

## OPINION

¶ 1        Pursuant to the Illinois Environmental Protection Act (Act) (415 ILCS 5/1 *et seq.* (West 2010)), Waste Management of Illinois, Inc., filed an application with the Illinois Environmental Protection Agency (IEPA) for permits to expand a landfill in De Kalb County. To obtain the permits, Waste Management applied for siting approval from the county board of De Kalb County (County Board), which granted approval by a 16 to 8 vote. See 415 ILCS 5/39.2 (West 2010). As part of the approval process, Waste Management and the County Board entered into a host agreement under which Waste Management would pay $120 million in host fees over 30 years.

¶ 2        Stop the Mega-Dump (STMD), a group of citizens opposing the landfill expansion, filed an objection with the Illinois Pollution Control Board (PCB), arguing that the County Board's proceedings were fundamentally unfair under the Act. STMD's theory is that the County Board "rubber-stamped" Waste Management's application because the County Board was "desperate" for a revenue stream to pay for a $30 million jail expansion. The PCB concluded that the County Board's proceedings were not fundamentally unfair and affirmed the County Board's decision.

¶ 3        STMD appeals to this court for direct administrative review of the PCB's decision. STMD renews its argument that the County Board's siting approval proceedings were fundamentally unfair because (1) the County Board's procedural rules barred the general public from participating in the hearing; (2) Waste Management engaged in improper *ex*

*parte* communication by taking certain County Board members on tours of Waste Management's Prairie View Landfill in Will County; and (3) the County Board prejudged Waste Management's application and approved it without a fair and impartial review. Respondents, the PCB, the County Board, and Waste Management, argue that (1) STMD was not prejudiced by the procedural restrictions, because the hearing officer relaxed those rules and allowed any member of the public, including members of STMD, to fully participate in the hearing; (2) the tours of the other landfill were not improper, because they occurred before Waste Management filed its application; and (3) there was no credible evidence that County Board members prejudged adjudicative facts. We have reviewed respondents' responses to STMD's arguments and conclude that STMD has not sustained its burden on review. Therefore, we affirm the PCB's decision.

¶ 4                                    I. BACKGROUND

¶ 5                          A. The De Kalb County Landfill

¶ 6        The existing landfill is northeast of the intersection of Somonauk Road and Girler Road in unincorporated De Kalb County. The landfill is 245 acres and consists of an old area, a north area, and an active area. The old area is 24 acres that are believed to have operated from 1958 to 1974. The north area, which was constructed with a clay liner and without a synthetic standard liner, is 38 acres and was granted a permit in 1974; and filling was accomplished by the trench-fill method to the ground surface. The active area was granted a permit in 1989 and continues to receive waste.

¶ 7        The proposed expansion will consist of (1) the exhumation of the old area and disposal of the exhumed waste in a composite-lined cell, (2) development of a 61-acre waste disposal area above and adjoining the existing 88-acre waste footprint, and (3) the development of a 179-acre waste disposal area east of Union Ditch No. 1. The expansion will result in the landfill receiving about 1,800 tons of solid waste per day but no more than 500,000 tons per year. The expansion will add 23.2 million tons of capacity for 46 years on a 595-acre parcel. The service area of the expanded landfill will be 17 counties.

¶ 8                          B. The Landfill Siting Process

¶ 9        Before expanding an existing pollution control facility, a facility operator must obtain construction and operation permits from the IEPA. 415 ILCS 5/39(a) (West 2010); see 415 ILCS 5/3.330(b)(2) (West 2010); 35 Ill. Adm. Code 812.101 (1994). Before the IEPA may grant the necessary permits, the facility operator must obtain from the local governmental unit siting approval for the expansion. See 415 ILCS 5/39(c), 39.2 (West 2010); 35 Ill. Adm. Code 812.105 (2006). Because the existing landfill is in unincorporated De Kalb County, the County Board is the local governmental unit that reviews siting approval applications for pollution control facilities. See 415 ILCS 5/39(c) (West 2010).

¶ 10       An applicant for local siting approval must submit sufficient details describing the proposed facility to demonstrate compliance, and the siting approval will be granted only if the proposed facility meets the nine criteria set forth in section 39.2(a) of the Act. 415 ILCS 5/39.2(a) (West 2010). The Act requires the siting authority to hold at least one public

hearing concerning the application. 415 ILCS 5/39.2(d) (West 2010); *Fox Moraine, LLC v. United City of Yorkville*, 2011 IL App (2d) 100017, ¶ 14. Any person may file written comments concerning the appropriateness of the proposed site, and the siting authority shall consider any comment received or postmarked not later than 30 days after the date of the last public hearing. 415 ILCS 5/39.2(c) (West 2010); *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 14. Publicly expressing an opinion on an issue related to a site review proceeding shall not preclude a member of the siting authority from taking part in the proceeding and voting on the issue. 415 ILCS 5/39.2(d) (West 2010); *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 14. The siting authority's decision must be in writing and must specify the reasons for the decision. 415 ILCS 5/39.2(e) (West 2010); *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 14. In granting approval for a site, the siting authority "may impose such conditions as may be reasonable and necessary to accomplish the purposes of [section 39.2] and as are not inconsistent with regulations promulgated by the [PCB]." 415 ILCS 5/39.2(e) (West 2010). The public hearing shall develop a record sufficient to form the basis of an appeal of the decision. 415 ILCS 5/39.2(d) (West 2010).

¶ 11   Section 40.1(b) of the Act provides that, if the siting authority approves the application under section 39.2, "a third party other than the applicant who participated in the public hearing" may petition the PCB for a hearing to contest the approval. 415 ILCS 5/40.1(b) (West 2010). Unless the PCB determines that the petition is duplicative or frivolous, or that the petitioner is so located as to not be affected by the proposed facility, the PCB shall hear the petition in accordance with section 40.1(a) and its procedural rules governing denial appeals. The petitioner bears the burden of proof. 415 ILCS 5/40.1(b) (West 2010). Section 40.1(a) provides that "[i]n making its orders and determinations under this Section the [PCB] shall include in its consideration the written decision and reasons for the decision of the [siting authority], the transcribed record of the hearing held pursuant to [section 39.2(d)], and the fundamental fairness of the procedures used by the [siting authority] in reaching its decision." 415 ILCS 5/40.1(a) (West 2010). Hearings before the PCB are based exclusively on the record before the County Board, except that evidence may be introduced on the fundamental fairness of the County Board's siting procedures where the evidence necessarily is outside the record. *Land & Lakes Co. v. Pollution Control Board*, 319 Ill. App. 3d 41, 48 (2000).

¶ 12   Section 39.2(g) of the Act provides that the siting approval procedures, criteria, and appeal procedures provided for in the Act for new or expanded pollution control facilities shall be exclusive and that local zoning or other local land use requirements do not apply to such siting decisions. 415 ILCS 5/39.2(g) (West 2010). Notwithstanding section 39.2(g), the appellate court has held that a siting authority is not bound by the siting approval procedures, criteria, or appeal procedures provided for in the Act and may establish its own rules governing conduct of a siting hearing so long as those rules are fundamentally fair and not inconsistent with the Act. *City of Elgin v. County of Cook*, 257 Ill. App. 3d 186, 192 (1993); *Waste Management of Illinois, Inc. v. Pollution Control Board*, 175 Ill. App. 3d 1023, 1036 (1988).

¶ 13   In 2007, the County Board adopted a Regional Pollution Control Facility Siting Ordinance (Ordinance), which governs all proceedings regarding siting approval. De Kalb

-4-

County Code § 50-51 *et seq.* (eff. Sept. 19, 2007). With certain exceptions that do not apply here, the Ordinance provides that no site approval for the development or construction of a new pollution control facility or expansion of an existing pollution control facility in De Kalb County may be granted by the County Board unless an application is filed for approval of such a site and is submitted for consideration to the County Board. De Kalb County Code § 50-52.

¶ 14    The Ordinance provides that, before submitting a siting application, the facility operator and the County Board must negotiate a host agreement. De Kalb County Code § 50-54(a)(1). Waste Management and the County Board began negotiating the host agreement for the landfill expansion in 2008. In February 2009, Waste Management made one presentation to the County Board's *ad hoc* solid waste committee and one presentation to the full board. The public was free to attend both meetings and to ask questions. The County Board sent notice of the meetings to the press, and the meetings were announced on the county's Web site. However, no member of the public attended either meeting. At the meetings, Waste Management familiarized the County Board with the draft host agreement and its financial terms.

¶ 15    Waste Management and the County Board signed the host agreement on March 18, 2009. The host agreement states that "[b]y entering into this Agreement, the County does not express any opinion or commitment with respect to the siting application" and that it will apply in the event of final siting approval. Among other things, Waste Management guaranteed at least 25 years' disposal capacity for nonhazardous waste generated by De Kalb County. Waste Management agreed to a property value guarantee plan and domestic water well monitoring for properties within one-half mile of the waste footprint. Waste Management agreed to indemnify De Kalb County for any liability relating to operation and closure and to carry general liability insurance of $10 million and pollution liability insurance of $20 million while the landfill is in operation and for 30 years thereafter. Waste Management also agreed to actively promote key responsibilities of environmental stewardship, including provisions for a methane gas recovery facility, citizen forum procedures, and a household hazardous waste collection program.

¶ 16    Once the County Board and Waste Management entered into the host agreement, the Ordinance authorized the County Board to conduct a prefiling review of a draft siting application to allow Waste Management to address concerns about the proposal before the broader application process began. See De Kalb County Code §§ 50-51, 50-54(a)(2). The County Board retained Patrick Engineering, a firm that conducted the prefiling review of Waste Management's application from July to November 2009 and made certain recommendations regarding the facility's design, location, and proposed operation to protect the public health, safety, and welfare. See 415 ILCS 5/39.2(a)(ii) (West 2010).

¶ 17    Following the prefiling review, the facility operator submits a formal application with the applicable fees. Waste Management filed its 7,000-page application on November 30, 2009. An application and all related documents are made available for public inspection (De Kalb County Code § 50-54(b), (c), (d)), and any person may file a written comment with the County Board concerning the appropriateness of the proposed site for its intended purpose (De Kalb County Code § 50-55(a)).

¶ 18    The Ordinance establishes a Pollution Control Facility Committee (Committee), which consists of 7 of the County Board's 24 members, and the Committee elects a hearing officer. De Kalb County Code § 50-53. The Committee reviews the facility operator's application by examining the application, considering the written comments from the public, and convening the public hearing on the application. 415 ILCS 5/39.2(c), (d) (West 2010); De Kalb County Code §§ 50-55, 50-56. The Ordinance provides that, during the public hearing, the Committee shall "receive testimony *** from the applicant and witnesses the applicant may call, any county witnesses, and other witnesses or objectors" and shall recommend approval only if the proposed facility meets the criteria set forth in section 39.2(a) of the Act. De Kalb County Code § 50-56(d).

¶ 19    In this case, the Committee conducted a public hearing over six days from March 1, 2010, to March 11, 2010. Following the hearing, the Committee recommended approval of the application. On May 10, 2010, by a 16 to 8 vote, the County Board granted Waste Management's application for landfill expansion subject to the conditions in the county's resolution No. 2010-31.

¶ 20    On June 11, 2010, STMD timely filed a petition asking the PCB to review the County Board's decision to grant Waste Management siting approval. See 415 ILCS 5/40.1(b) (West 2010). On March 17, 2011, the PCB issued its final decision, concluding that the County Board's proceedings were not fundamentally unfair under the Act.

¶ 21    STMD sought reconsideration of the PCB's order on April 20, 2011, and the PCB denied the motion on May 19, 2011. STMD timely filed its petition for administrative review in this court on June 16, 2011. We address the details of the County Board's prefiling review and public hearing and the PCB's decision in the context of the issues raised by STMD on appeal.

¶ 22                                    II. ANALYSIS

¶ 23    STMD appeals the PCB's decision to affirm the County Board's siting approval of the landfill expansion. STMD argues that the County Board's siting approval proceedings were fundamentally unfair because (1) the County Board's procedural rules barred the general public from participating in the hearing; (2) Waste Management engaged in improper *ex parte* communication by taking certain County Board members on tours of Waste Management's Prairie View Landfill; and (3) the County Board prejudged Waste Management's application and approved it without a fair and impartial review.

¶ 24    We note that, when STMD petitioned the PCB to review the County Board's decision to grant Waste Management siting approval, STMD raised certain issues that it does not raise on appeal. Specifically, STMD argued to the PCB that (1) the siting proceeding was fundamentally unfair for reasons other than the prefiling tours and the Ordinance's restriction on participation at the hearing, (2) the decision was contrary to the manifest weight of the evidence with respect to certain siting criteria in section 39.2(a) of the Act (415 ILCS 5/39.2 (West 2010)), and (3) some of the conditions placed on the County Board's approval were improper. On appeal, STMD argues only that (1) the Ordinance caused the hearing to be fundamentally unfair; (2) the prefiling tours were improper *ex parte* communications; and

-6-

(3) the tours and financial consideration of the proposed jail expansion caused the County Board to prejudge the application in Waste Management's favor. We consider STMD's remaining arguments forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) ("Points not argued are waived ***.").

¶ 25 In determining whether the proceedings were fundamentally fair, we note the appropriate standard of review. An administrative agency's determination of facts will not be disturbed unless it is contrary to the manifest weight of the evidence. *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 59. When an agency decision presents a mixed question of law and fact, the agency decision will be reversed only if it is clearly erroneous. The "clearly erroneous" standard lies between the deferential manifest-weight-of-the-evidence standard and the *de novo* standard. *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 59. We apply the "clearly erroneous" standard to decisions on mixed questions to provide some deference to an agency's experience and expertise in dealing with its particular subject matter. Whether siting proceedings were fundamentally fair is a mixed question of law and fact, and thus we apply the "clearly erroneous" standard. *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 59 (citing *Peoria Disposal Co. v. Illinois Pollution Control Board*, 385 Ill. App. 3d 781, 796 (2008)).

¶ 26 When we review an administrative decision, we exercise special statutory jurisdiction and thus our review is limited by the Act, which allows us to review the PCB's decision rather than the siting authority's decision. *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 15 (citing *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 122 (2007)). We have jurisdiction pursuant to Illinois Supreme Court Rule 335 (eff. Feb. 1, 1994), section 3-104 of the Code of Civil Procedure (735 ILCS 5/3-104 (West 2010)), and section 41(a) of the Act (415 ILCS 5/41(a) (West 2010)).

¶ 27 "A siting authority's role in the siting-approval process is both quasi-legislative and quasi-adjudicative." *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 60. "Recognizing this dual role, courts have interpreted the applicant's right to fundamental fairness as incorporating minimal standards of procedural due process, including the opportunity to be heard, the right to cross-examine adverse witnesses, and impartial rulings on the evidence." *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 60. "The members of a siting authority are presumed to have made their decisions in a fair and objective manner." *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 60. "This presumption is not overcome merely because a decision-maker has previously taken a public position or expressed strong views on a related issue." *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 60; see 415 ILCS 5/39.2(d) (West 2010). "To show bias or prejudice in a siting proceeding, the petitioner must show that a disinterested observer might conclude that the siting authority, or its members, had prejudged the facts or law of the case." *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 60. "[I]ssues of bias or prejudice on the part of the siting authority are generally considered forfeited unless they are raised promptly in the original siting proceeding, because it would be improper to allow the petitioner to knowingly withhold such a claim and to raise it after obtaining an unfavorable ruling." *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 60.

¶ 28                              A. Ordinance and Articles

¶ 29    STMD challenges certain sections of the County Board's "Articles of Rules and Procedures of the Pollution Control Facility Committee" (Articles), which were implemented to govern the Committee's application and hearing process. STMD argues that section 5 of Article III rendered the public hearing fundamentally unfair by discouraging and limiting public participation. Section 5 provides as follows:

> "For purposes of the hearing, a 'participant' may only be one of the following: an owner of property subject to notification under section 50-54(a)(3) of the ordinance; an attorney representing said property owners; or an official or an attorney representing a township or a municipality located within one and one half miles of the proposed facility. All other parties will be limited to public comment during the public comment time of the public hearing or to written comment through the written comment period."

¶ 30    The persons subject to notification under section 50-54(a)(3) of the Ordinance include owners of property (1) "within the subject area not solely owned by the applicant," (2) adjoining the subject property, (3) that would be adjoining but for public right-of-ways and other easements that do not extend more than 400 feet from the subject property line, and (4) adjoining those properties above. De Kalb County Code § 50-54(a)(3).

¶ 31    Section 6, which governs the submission of evidence at the hearing, requires participants to file copies of exhibits five days before the hearing and members of the public who speak during the public comment time to provide copies of exhibits "prior to the time designated for the public to speak." Section 6(F) provides that "[a]ll parties wishing to testify or cross-examine must submit written notification of said intent to the County Clerk at least seven (7) days before the first date of the hearing. If the hearing should extend beyond one session, no additional parties shall be allowed to testify or cross-examine." Despite these restrictions, section 6(G) allows some flexibility, by providing that "[i]n order to insure fundamental fairness, compliance with the Act, allow for unforeseeable circumstances, and to protect the public interest, the Committee, by majority vote of members present and voting, may waive any requirements of this section."

¶ 32    The County Board scheduled the Committee's public hearing for March 2010 and retained John McCarthy, an attorney with experience in conducting siting hearings, to serve as hearing officer. STMD does not contest the adequacy of service of the application or notice of the public hearing.

¶ 33    The County Board held the public hearing over six days from March 1, 2010, to March 11, 2010. The Ordinance and the Articles define the class of "participants" allowed to cross-examine witnesses, and those participants ordinarily must comply with preregistration requirements. However, McCarthy allowed all persons attending the hearing the opportunity to participate and to ask questions of witnesses, as well as to present public comment. The February 26, 2010, issue of the *County Chronicle*, a newspaper of general circulation in De Kalb County, contained an article with the headline, "Landfill Hearing Officer Will Be Accommodating" and stated McCarthy's intent to relax the participation requirements.

¶ 34    McCarthy began the hearing with a short statement concerning the requirements of section 39.2 of the Act. McCarthy introduced the members of the Committee and had

counsel for Waste Management and counsel for the County Board introduce themselves. STMD was not represented by counsel, but McCarthy acknowledged two members of STMD, Dan Kenney and Mac McIntyre, who were present. Kenney immediately moved on behalf of STMD to "disqualify the County Board, to terminate [the] proceeding, and to deny the siting application." Kenney argued, *inter alia*, that the Articles unfairly limited the role of "participants" and that McCarthy had not cured the error "because we can never know how many people will fail to appear today because they believed they would not be allowed to participate." McCarthy heard arguments from counsel for Waste Management and for the County Board, and McCarthy denied STMD's motion.

¶ 35 During the six days of proceedings, Waste Management presented the testimony of eight witnesses on the various siting criteria. See 415 ILCS 5/39.2(a) (West 2010). Five individuals asked to participate in the hearing and cross-examined each of Waste Management's witnesses. McCarthy explicitly invited the public to ask questions and provide oral public comment during the hearing and advised the public that any person could file a written comment. Twenty individuals provided oral public comment, and all written comments were entered into the record. Although STMD was not represented by counsel, several members spoke at the hearing. STMD presented Dr. Aubrey Serewicz as a witness and cross-examined all eight witnesses presented by Waste Management.

¶ 36 At the close of the hearing, McCarthy directed the participants to file briefs by April 2, 2010. Briefs were filed by Waste Management on April 2, 2010, and by STMD on April 5, 2010, and April 7, 2010. McCarthy set a 30-day public comment period, which expired on April 12, 2010. From February 5, 2010, to April 12, 2010, the County Board received 78 separate communications that it included in the record as public comments. The County Board also recorded as a public comment an April 27, 2010, letter from a County Board member. The overwhelming majority of the public comments were opposed to the landfill and the quasi-adjudicatory siting process in general.

¶ 37 The Committee met to the discuss the application several times from April 12, 2010, to April 27, 2010, after which the Committee recommended siting approval subject to conditions specified in the De Kalb County staff report.

¶ 38 Based on this uncontested evidence of what occurred at the County Board's public hearing, the PCB concluded that STMD had failed to demonstrate that the procedures set forth in the Ordinance and the Articles caused the proceedings to be fundamentally unfair or reflected any intent to discourage public participation. The PCB found that STMD had failed to prove any prejudice from the mere existence of the Ordinance and the Articles or that these procedures were fundamentally unfair on their face.

¶ 39 Specifically, the PCB found that the County Board enacted the procedures two years before Waste Management applied for siting approval and that no one objected to the procedures before the March 2010 public hearing. The PCB pointed out that the Ordinance and the Articles included as participants more persons than the landowners entitled to notice under section 39.2 of the Act and that STMD presented no evidence that any person failed to participate at the hearing because he or she was not included in the class of participants. The PCB rejected STMD's "bald speculation that the County's adopted procedures may have

-9-

chilled or dampened participation by the public." Moreover, the PCB observed that McCarthy waived the procedures, allowing any member of the public to ask questions; present witnesses, testimony, and exhibits; and comment on the proposed expansion. Finally, the PCB determined that McCarthy actually enhanced the public's right to comment by setting the filing deadlines so that the public could respond to the closing statements made by Waste Management and the participants.

¶ 40     We conclude that the PCB's determination was not clearly erroneous. We reject STMD's argument that the public hearing was fundamentally unfair because the Ordinance and the Articles too narrowly define the class of persons allowed to act as "participants," *i.e.*, parties to the proceedings who have the right to present evidence and cross-examine witnesses at the public hearing.

¶ 41     First, giving the language of the Act its plain and commonly understood meaning (*Scadron v. City of Des Plaines*, 153 Ill. 2d 164, 185 (1992)), we conclude that the Act does not provide the general public the right to act as "participants" in local siting proceedings. The Act affords specific persons and entities particular rights in relation to the local siting process, but does not give the general public the right to appear and to participate.

¶ 42     For example, section 39.2(b) provides that certain property owners, defined by their proximity to the facility, be served with written notice of the intent to apply for siting approval. 415 ILCS 5/39.2(b) (West 2010) (the applicant shall serve written notice "on the owners of all property within the subject area not solely owned by the applicant, and on the owners of all property within 250 feet in each direction of the lot line of the subject property, said owners being such persons or entities which appear from the authentic tax records of the County in which such facility is to be located; provided, that the number of all feet occupied by all public roads, streets, alleys and other public ways shall be excluded in computing the 250 feet requirement; provided further, that in no event shall this requirement exceed 400 feet, including public streets, alleys and other public ways"). Furthermore, section 39.2(d) authorizes the members or representatives of certain municipal governing authorities and county boards to appear and participate at the public hearing. 415 ILCS 5/39.2(d) (West 2010) ("Members or representatives of the governing authority of a municipality contiguous to the proposed site or contiguous to the municipality in which the proposed site is to be located and, if the proposed site is located in a municipality, members or representatives of the county board of a county in which the proposed site is to be located may appear at and participate in public hearings held pursuant to this Section."). The Act does not grant the right to "participate" in public hearings or confer adjudicative due process rights to any person other than the applicant and those local government members or representatives mentioned in section 39.2(d).

¶ 43     STMD cites no authority for the proposition that the Act's fundamental fairness guarantee affords all members of the general public the right to appear as a party and fully participate, including presenting evidence and cross-examining the applicant's witnesses at the public hearing. To the extent that the general public is granted rights under the Act, those rights are limited to (1) public inspection of the application and related documents and materials on file and (2) public comment concerning the appropriateness of the proposed site for its intended purpose. 415 ILCS 5/39.2(c) (West 2010). If the General Assembly had

intended to give the general public the right to act as full "participants" in the siting approval process, it could have mentioned the general public in section 39.2(d).

¶ 44 In any event, the Articles allow for the general public to participate in a way the Act does not prescribe. Section 7(D) of Article III provides that, during the hearing, "[o]ther persons shall be allowed to submit questions to the hearing officer, who shall exercise discretion in the manner in which such questions are to be posed to witnesses." Thus, section 7(D) of Article III confers the very right that STMD argues the public was denied, because it gives the hearing officer discretion to cross-examine witnesses with written questions submitted by members of the public who otherwise would not be afforded the right to participate under the Act.

¶ 45 Second, the Ordinance and the Articles define "participants" more broadly than the class entitled to notice of the public hearing under the Act. The persons subject to notification under section 50-54(a)(3) of the Ordinance include owners of property (1) "within the subject area not solely owned by the applicant," (2) adjoining the subject property, (3) that would be adjoining but for public right-of-ways and other easements that do not extend more than 400 feet from the subject property line, and (4) *adjoining those properties above*. De Kalb County Code § 50-54(a)(3). In contrast, section 39.2(b) provides for prefiling notice of a request for site approval only to owners of property within 400 feet of the site, and not to owners of adjoining properties. 415 ILCS 5/39.2(b) (West 2010). Thus, the class of persons entitled to notice under the Articles is actually broader than the class entitled to notice under section 39.2(b). By broadening the class of participants, the Articles confer greater adjudicative due process rights than the Act requires.

¶ 46 Third, the hearing officer relaxed the participation limitations in the Ordinance and the Articles to allow all persons, including members of STMD, to fully participate in the hearing. About one week before the proceedings began, the Committee waived all cross-examination limitations set forth in the Articles. Thus, the County Board gave STMD and other members of the general public ample notice of the opportunity to cross-examine Waste Management's witnesses. The Act requires the PCB to "include in its consideration *** the fundamental fairness of the procedures *used* by the [siting authority] in reaching its decision," which suggests that the actual procedures followed, including the waiver of participation restrictions, may be considered. (Emphasis added.) 415 ILCS 5/40.1(a) (West 2010).

¶ 47 Acknowledging that the Committee allowed it to participate fully in the proceedings, STMD concedes that it suffered no prejudice to its own interests. Moreover, STMD did not present to the PCB any evidence that the Committee's Articles prevented any person who wished to participate in the siting proceedings from doing so. The PCB did not clearly err in rejecting STMD's speculation that section 5 of Article III, on its face, chilled participation by other individuals. STMD failed to meet its burden of establishing that the proceedings actually were unfair. See *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 15.

¶ 48 B. Tours of the Prairie View Landfill

¶ 49 In March 2009, around the time the host agreement was finalized, Waste Management offered the County Board tours of the Prairie View Landfill so the members could familiarize

themselves with a facility that was comparable to the proposed expansion in size, daily volume, and certain design elements. STMD argues that, by leading the tours, Waste Management engaged in improper *ex parte* communication during the review of the siting application. The PCB made the following factual findings regarding the tours.

¶ 50 Waste Management hosted six tours of the Prairie View Landfill from July 18, 2009, to November 21, 2009. Fifteen of the twenty-four County Board members toured the facility, but no member of the public was invited to attend. The tours were facilitated by Dan Hoekstra, a Waste Management employee, and Lee Addleman, a consultant who had recently retired from an executive position at Waste Management. Hoekstra and Addleman made narrative comments and answered questions during the tours. Six tours were scheduled rather than one to accommodate the schedules of the County Board members who eventually toured the Prairie View Landfill.

¶ 51 With the exception of one County Board member who drove himself and was reimbursed for his mileage, Waste Management transported the participants to the Prairie View Landfill. The tours started in the "scale house" where trucks are received. The participants saw how the trucks are logged in, weighed, and video recorded. The tours proceeded to an active area where the participants saw the day-to-day operations, including the construction of a cell. Waste Management provided the participants with a lunch of Jimmy John's sandwiches and soda pop in a conference room. One attendee stated that the bus departed the County's offices at 8:30 a.m. and returned at 2 p.m. or 3 p.m. Waste Management filed the formal siting application about one week after the last tour.

¶ 52 Based on these factual findings, the PCB held that no improper *ex parte* contacts occurred, because (1) the prohibition against *ex parte* communication is "not intended to be a 'gag order' on the decision-maker"; (2) the tours occurred during the host agreement negotiations and before Waste Management filed its application; and (3) the prefiling review of the draft application was authorized by the Ordinance and was of the type the PCB previously had found not to constitute an *ex parte* contact.

¶ 53 Citing the statements of several County Board members who enthusiastically described the tours as educational and helpful for understanding how a complex landfill operates, STMD argues that the tours were prejudicial in that Waste Management gained valuable "one-on-one time with the decision makers" and "there is no way of knowing what information was discussed on the tours." Respondents correctly point out that STMD misstates the law in that (1) the tours, like other prefiling contacts, do not qualify as improper *ex parte* communication, because they occurred before Waste Management filed its application and (2) prefiling contacts alone do not require reversal but are merely relevant to show prejudgment.

¶ 54 Because members of siting authorities are not judges, but locally elected officials, courts have recognized that the nature of the siting approval proceedings renders *ex parte* communication between the public and the decision-makers inevitable. *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 61. "Naturally, constituents will relay their concerns to these officials, unaware that the officials will be acting in an adjudicatory role and that such *ex parte* communication is improper. [Citation.] A reviewing court will not reverse a decision because

-12-

members of the siting authority have received improper *ex parte* communications unless there is a showing that the petitioner suffered prejudice as a result of those communications." *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 61. If the applicant is provided with a full and complete opportunity to present evidence in support of its application, mere expressions of public sentiment are not sufficient for a showing of prejudice, and the existence of strong public opposition does not render the proceedings fundamentally unfair. *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 61.

¶ 55 In this case, STMD does not object to Waste Management's contacts with the County Board during the review of the siting application. Instead, STMD challenges contacts occurring *before* Waste Management filed its application. Until Waste Management filed its application, members of the County Board were legislators, rather than adjudicators, and there were no "parties" to a "proceeding" entitled to notice and participation. The County Board assumed its adjudicative role only after Waste Management initiated the siting proceedings by filing the application. See *Waste Management*, 175 Ill. App. 3d at 1043. By definition, there can be no *ex parte* communications until a siting application has been filed. Thus, the guided tours of the Prairie View Landfill do not qualify as *ex parte* communications. That said, prefiling contacts are not irrelevant to a claim of fundamental unfairness.

¶ 56 In *Land & Lakes*, the appellate court considered the impact of prefiling contacts on the fairness of a siting hearing. The court determined that certain prefiling contacts did not demonstrate that the siting authority had prejudged the application, and therefore the court rejected the argument that the siting authority had "forfeited its neutrality." *Land & Lakes*, 319 Ill. App. 3d at 50. While prefiling contacts are not *ex parte* communications, they might support a claim of fundamental unfairness if they are evidence of prejudgment. An objector demonstrates prejudice from an *ex parte* communication by establishing that the contact hindered the preparation of its case against the proposal. *Southwest Energy Corp. v. Pollution Control Board*, 275 Ill. App. 3d 84, 93 (1995). In contrast, an objector accusing the siting authority of prejudgment must identify specific evidence showing that members of the siting authority were actually biased. *Residents Against a Polluted Environment v. Pollution Control Board*, 293 Ill. App. 3d 219, 225-26 (1997). To establish fundamental unfairness in this case, STMD has the burden of showing specific evidence that the County Board was actually biased. For the following reasons, we agree with respondents that the challenged prefiling contacts do not show prejudgment of the application.

¶ 57                                       C. Prejudgment

¶ 58 STMD alleges that the hearing was fundamentally unfair because the County Board failed to base its approval on the evidence presented during the hearing and instead prejudged Waste Management's application in light of political and financial considerations. Specifically, STMD argues that Waste Management's two "mini-hearing presentations" during the host agreement negotiations in February 2009 and the private tours of the Prairie View Landfill from July through November 2009 had the cumulative effect of convincing the County Board to approve the application before Waste Management presented its

evidence at the hearing in March 2010.

¶ 59     In the review proceedings before the PCB, County Board members testified that they voted solely on the basis of the evidence and arguments concerning the criteria of section 39.2(a) of the Act as presented during the siting hearing. The members repeatedly stated on the record that their decision was not based on prefiling contacts but only on the evidence. The PCB found "no credible evidence" that the members who voted for siting approval prejudged the application or were biased in Waste Management's favor. The PCB found that "[a]ny inferences that potentially could be drawn about possible bias or predisposition from various comments made at various times by County Board members are more than negated by their sworn testimony."

¶ 60     STMD challenges the PCB's finding of fact, calling the County Board members' testimony "self-serving" and of "dubious credibility." However, STMD admits that "arguably, there was probably sufficient evidence and argument on both sides that neither an approval nor a denial would have been against the manifest weight of the evidence." The PCB's determination of facts will not be disturbed unless it is contrary to the manifest weight of the evidence. *Fox Moraine*, 2011 IL App (2d) 100017, ¶ 59. In this case, the PCB's credibility determinations are not against the manifest weight of the evidence, because the opposite conclusion is not clearly evident. See *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008).

¶ 61     STMD further argues that the County Board, "months before the public hearing on the siting application, committed to fund its desperately needed jail expansion with [landfill host] revenues," which proves prejudgment. STMD characterizes the landfill expansion and jail renovation as "connected projects, proceeding on tandem timelines, with the jail expansion driving the outcome of the siting proceeding." STMD misrepresents the County Board's actions. In fall 2009, the County Board passed a resolution expressing the need for the jail expansion. At the time, the County was spending $600,000 per year to house its inmates in other counties. The resolution authorized, but did not require, the county to issue bonds for the purpose of funding the jail expansion. The County Board passed an ordinance stating that, if the bonds were issued, they could be repaid from one of several potential revenue sources, including sales tax receipts, United States bond subsidy payments, and "host community agreement fees to be paid to the County with respect to the De Kalb County Landfill currently operated by Waste Management." County Board members testified that alternate means of funding the jail expansion included issuing general obligation bonds funded by a tax increase, raising revenue through a referendum, and "a mixture perhaps of sales taxes from the County farm property which was currently anticipated to go toward the courthouse expansion *** plus a referendum." County Board members also discussed authorizing the opening of a casino, which would represent a "significant source of revenue." Otherwise, if no new revenue were obtained to pay for the jail expansion, the county would continue to pay other counties to receive jail inmates.

¶ 62     Based upon the findings of fact made by the PCB, which were not against the manifest weight of the evidence, we conclude that the PCB did not clearly err in holding that the County Board did not prejudge the application. We agree with the County Board's argument on appeal that the landfill expansion's financial benefit and the county's need for revenue

to pay for a larger jail are not adjudicative facts and, therefore, any County Board member's consideration of the financial impact is not relevant to siting approval. Adjudicative facts are "whether the particular landfill, or expansion, for which the permit is sought meets the specific criteria set out in section 39.2 of the Act." *E&E Hauling, Inc. v. Pollution Control Board*, 116 Ill. App. 3d 586, 598 (1983). Local siting authorities may consider such economic benefit if they find that the statutory criteria have been met. *Fairview Area Citizens Taskforce v. Pollution Control Board*, 198 Ill. App. 3d 541, 546-47 (1990), *abrogated on other grounds by Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 116-17 (2007) (statements by members of siting authority that the landfill would provide economic benefit to community do not indicate prejudgment of adjudicative facts). Revenue or other financial considerations are irrelevant to a prejudgment inquiry because neither the local siting authority nor its members will realize and enjoy the additional potential revenue or pecuniary benefit. It is the community at large that stands to gain or lose from the local siting authority approving or disapproving the site. *Woodsmoke Resorts, Inc. v. City of Marseilles*, 174 Ill. App. 3d 906, 909 (1988).

¶ 63    County boards and other governmental agencies routinely make decisions that affect their communities' revenues. They are public service bodies that must be deemed to have made decisions for the welfare of the governmental units and their constituents. Their members are subject to public disapproval, as elected members can be turned out of office and appointed members replaced. *E&E Hauling, Inc. v. Pollution Control Board*, 107 Ill. 2d 33, 42 (1985).

¶ 64    STMD accuses certain County Board members of making statements to the effect that the financial implications of the jail deficiency and the proposed host revenues from landfill expansion made siting approval a "done deal." Respondents dispute whether some of these statements were ever made. In any event, publicly expressing an opinion on an issue related to a site review proceeding shall not preclude a member of the siting authority from taking part in the proceeding and voting on the issue. 415 ILCS 5/39.2(d) (West 2010). Public statements of county board members regarding landfills and their effects on the community do not prove prejudgment of the adjudicative facts. *Waste Management*, 175 Ill. App. 3d at 1040; see also *Peoria Disposal Co.*, 385 Ill. App. 3d at 798 (membership in organization opposed to landfill does not indicate prejudgment). The statements that STMD challenges do not support a prejudgment claim, because they concern the financial health of the County and the expected financial impact of granting or denying siting approval, not the adjudicative facts in section 39.2(a) of the Act. We conclude that STMD has failed to sustain its burden of showing that the County Board prejudged Waste Management's application.

¶ 65                                D. Harmless Error

¶ 66    Finally, STMD contends that the fundamental unfairness of the County Board's public hearing was not harmless error. As we conclude that no error occurred, we need not address STMD's harmless error argument.

¶ 67                                III. CONCLUSION

¶ 68    For the reasons stated, we affirm the PCB's decision to affirm the County Board's

approval of Waste Management's landfill siting application in De Kalb County.

¶ 69        Affirmed.